## MASSACHUSETTS BENEFIT LIFE ASSOCIATION *v.* ROBINSON.

1. A stipulation in a policy of life-insurance, that "this policy is incontestable after three years from its date, provided three full yearly payments have been made upon it, except that error in the age of the insured is open to adjustment" in a manner therein prescribed, is valid; and after payment of the premiums called for, and the lapse of time specified, the insurer is, with the exception indicated, precluded from setting up any defense based upon misrepresentations or warranties made by the insured in his application, whether fraudulent or otherwise.

2. If a policy of insurance is capable of being construed in two ways, that interpretation must be placed upon it which is most favorable to the insured.

3. A receipt by the insurer of a premium after default in the payment thereof according to the terms of the policy, will generally constitute a waiver of the forfeiture of the policy on account of such default.

4. The giving of a note by the insured for a premium and the acceptance of such note by the insurer as payment for the premium is equivalent to cash payment; and default in the payment of such note at maturity will not work a forfeiture of the policy, unless it is so expressly stipulated by the parties at the time such note is given and received.

5. Where a policy of insurance became lapsed by the non-payment of premiums, and the insured obtained a reinstatement by a fraudulent misrepresentation of material facts, then the contract for reinstatement was void and the policy remained lapsed.

6. The recitals in an application for reinstatement made by the insured upon a mistaken idea that such application was necessary, when in point of fact it was not, are not binding on him, and any misrepresentations therein made, induced by the statement of the insurer that the policy had lapsed, and that such representations were necessary for his reinstatement, will not constitute a valid defense to a suit on the policy.

7. Whether a given state of admitted or proved facts works a forfeiture or lapse of a policy of insurance is a question of law for the decision of the court; when there is an issue about the facts, the matter should be submitted to the jury under proper instructions.

8. The materiality of representations made by the insured in his application, under the laws of Georgia, is a question for the jury to decide. The manner in which this question shall be determined, being a matter affecting the remedy only, and not the "validity, form, or effect of the contract," is to be controlled by the lex fori, and not by the lex loci contractus.

9. The declarations made by the medical examiner in a letter to his insurance company, as to the habits of the applicant, are not binding on the latter, notwithstanding the fact that the application states that the medical examiner is the agent of the applicant in filling up the same and the applicant knows that under certain conditions a letter is to be written to the company by the examiner in relation to the application and the examination.

10. A statement in an application for reinstatement of a policy of insurance, rendered necessary by the lapse of the same, that the insured is in "good health," is not to be construed as a warranty that his health is absolutely perfect, but only that his health is practically the same as it was when the policy was issued.

11. There was no error requiring the grant of a new trial. If any error was committed, it was either favorable to the defendant, or harmless under the facts of the case. The case was fairly submitted to the jury, and there was evidence sufficient to authorize a finding of every issue in favor of the plaintiff, except the one hereafter alluded to. Except as above set out, the questions involved are not of such a character as to require extended discussion.

12. There was no evidence to authorize the conclusion that the defense was not made in good faith. The verdict for attorneys' fees and damages is therefore unauthorized; and direction is given, that the portion of the verdict and judgment relating to attorneys' fees and five per cent. damages be written off, and that the verdict for the principal and interest due on the policy stand, and that the costs in this court and all costs which have accrued in the court below since the rendition of the verdict be taxed against the defendant in error.

Argued December 1, 1897, — Decided May 24, 1898.

Action on insurance policy.    Before Judge Reid.    City court of Atlanta.    January term, 1897.

*Glenn & Rountree, A. R. Bryan, Abbott, Cox & Abbott* and *W. H. & E. R. Black,* for plaintiff in error.

*Dorsey, Brewster & Howell* and *Arthur Heyman,* contra.

COBB, J.    On March 12, 1888, John M. Robinson made an application to the Massachusetts Benefit Life Association for a policy of insurance upon his life for the sum of three thousand dollars.    To the application was attached the following certificate : "I, John Madison Robinson, of Atlanta, County of Fulton, State of Georgia, do hereby warrant each and all the foregoing particulars and statements to be true, and that I have not in this application for above-named contract concealed or withheld any material circumstance, or information, concerning the past or present state of my health or habits of life ; and I do hereby acknowledge, consent and agree that any untrue or fraudulent statements made above by me or any one else, or to any medical examiner of said Massachusetts Benefit Association, or any concealment of facts by me or any one else, may forfeit and cancel all rights to any benefit under the above-named

contract." To the application was also attached the following questions and answers: "Q. Are you, and have you always been, of sober and temperate habits? A. I am now, and have been for some time a total abstainer; formerly drank occasionally. Q. Do you usually have good health, and are you in good health? A. Yes. Q. What sickness, disease, or injury have you ever had? A. Pneumonia. Q. How long since you were under the care of a physician, and for what cause? A. Not since 1869, when I had pneumonia." The medical examination attached to such application was made and signed by C. C. Greene, M. D., and had attached to it the following certificate signed by the insured: "I further declare and agree that my answers to the above questions put by the medical examiner are correct and true, and that I am the person who signed the application on the opposite side, and was examined as above." The questions and answers referred to in the certificate, which are material to this investigation, are as follows: "Q. Has the party had any severe illness or injury? A. Had pneumonia nineteen years ago, and has fully recovered. Q. Is the party deaf, dumb, blind, lame, or maimed in any way? A. No. Q. Has weight increased or diminished, and how much, in two years? A. Have gained seven pounds in two years. Q. How often does the party use spirits? A. None at present. Q. How often does the party use beer or wine? A. None at present. Q. How often does the party use tobacco? A. Chews occasionally. Q. What has been his habit through life? A. Has drank some in the past. Q. Do you consider this a first-class, fair, doubtful, or bad risk? A. Fair risk. Q. What feature in the case makes you rate it other than the best? A. From past habits. (See letter.) Q. Do you advise the risk? Yes, or no? A. Yes. (If you have any hesitation in answering unqualifiedly, Yes, give the association the benefit of the doubt, and answer, No, writing a confidential letter to the medical director at the home office.)"

On March 17, 1888, the policy was issued, and contained, among others, the following stipulations: "That the statements and declarations made by and on behalf of said member in his application to become a benefit member of said association,

which are hereby referred to as the basis of this contract, and are a part thereof, and on the faith of which this policy is issued, are warranted to be in all respects true, and that no fact has been suppressed relating to his health or circumstances affecting the character of the risk, or the judgment of the association in accepting the same. This contract shall be void if said member shall at any time contract or fall into gross and confirmed habits of intoxication." Subsequently the policy above referred to was surrendered to the company, and one for five thousand dollars was issued to the insured, in which his wife was named as beneficiary. This policy was dated February 27, 1891, and contained the following stipulations, among others: "That the statements and declarations made by and on behalf of said member in his application to become a benefit member of said association, which are hereby referred to as the basis of this contract, and are part hereof, and on the faith of which this policy is issued, are warranted to be in all respects true, and that no fact has been omitted relating to the warranties. This policy is incontestable after three years from its date, provided three full yearly payments have been made upon it, except that error in the age of the insured is open to adjustment, and, if understated, the insured will be entitled only to the amount of insurance which the sum paid would have purchased at his correct age, if insurable in this association. Death of the insured in consequence of the use of intoxicating liquors or narcotics, or by his own hand or act, whether sane or insane, whether the act be voluntary or involuntary, within three years from the date hereof, is a risk not contemplated or covered by this contract, and against which this association does not insure. If the insured shall fall into the habit of becoming intoxicated, or into the habitual use of narcotics, or shall have delirium tremens, within three years of the date hereof, then this contract shall be void, and in such event the insured hereby authorizes and directs the association to cancel this contract and return to him the sum of all payments made thereon, which sum he agrees to accept for himself, his heirs or assigns, in full and complete settlement of all liability of said association under this contract. If the payments herein pro-

vided for are not received at the home office of the association at Boston within thirty days of each of the above-named dates on which the insured shall elect to pay respectively, such non-payment shall be accepted and taken as conclusive evidence that the party has decided to terminate his connection with the association, which connection shall thereupon terminate, and the party's contract with the association shall lapse and be void, and all rights thereunder be forfeited to the association, unless the time for payment be extended under the provision of section four. If the mortality experience of the association shall require any variation from said rates in any call, due notice will be given, but the association assumes no obligation to give any other notice of payments hereunder except as provided in section four. Each applicant to become a member must sign the association's form of application therefor, filled out by himself or some one on his behalf, and pass a satisfactory examination by one of this association's regularly appointed medical examiners. This policy shall not become operative, so as to bind the association, until the first payment is made thereon, and the policy is actually delivered to the member therein named, during his lifetime and while in good health. No agent of the association is authorized to make, fill up, or alter any such application; in doing any such act he is to be taken and considered as the agent of the applicant and not of the association. It is further expressly agreed that the place of this contract is the home office of the association in the City of Boston, and this contract shall be governed by and construed only according to the laws of the State of Massachusetts."

The application upon which this policy was issued had attached to it and signed by the insured the following certificate: "I do hereby warrant that each and all of the particulars and statements contained in this application for insurance are true, and that I have not, in either part of said application for above-named contract, concealed or withheld any material circumstance or information concerning the past or present state of my health, or habits of life; and I do hereby acknowledge, consent and agree that any untrue or fraudulent statement made therein by me, or on my behalf, or to any medical examiner,

whether written by my own hand or not, or any concealment of facts by me or any one else, may forfeit and cancel all rights to any benefit under the above-named contract; and I hereby expressly waive any and all provisions of law now existing, or that may hereafter exist, preventing any physician from disclosing any information acquired in attending me in a professional capacity or otherwise, or rendering him incompetent to testify as a witness in any way whatever. I agree that an affidavit of the treasurer of the said association, that notice of an assessment or annual dues has been addressed to me at the postoffice address appearing on the books of the association, and that the same has been mailed according to the usual course of business of said association, shall be admitted as evidence, and taken to be and constitute conclusive proof of the sending of such notice, in any and all suits on said certificate or policy. Dated, Atlanta, State of Georgia, this 4th day of Feb., 1891." The questions and answers in this application, which are material in the present case, are as follows: "Q. Name and address of your usual medical attendant? A. I have none. Q. Do you desire to make payments annually, semiannually, quarterly, or bimonthly? A. Quarterly." The report of the medical examiner attached to this application was signed by C. C. Greene, M. D., and attached thereto was the following warranty signed by the insured: "I do hereby warrant that the answers as written to the above questions, put by the medical examiner, are full, complete, and true, and the same shall be made a part of the herein referred to contract, and that I am the person who signed the application on the other side, and was examined as above." The questions and answers contained in the medical examiner's report, which are material to this investigation, were as follows: "Q. What sickness, disease, or injury, has applicant ever had? A. Had slight attack of dysentery about two years ago. Was sick for a few days, and recovered in good health? Q. Has applicant consulted or been advised by any physician regarding his health within the last five years? If so, whom, when, and for what ailment? A. No. See above. Q. If not treated within five years, how long since he was under the care of a physician, and for what

cause? A. Answer above. Q. Has applicant now any ailment, disease, or disorder, or has he suspicions of any? A. No. Q. Does applicant use malt or spirituous beverages? If so, what kind, and how many glasses in one day? A. Yes. Q. Has he ever used them? A. Yes. Q. Does he use opium or other narcotic in any form? A. No. Q. Does he use tobacco, and how much? A. Yes, moderately. Q. Is he engaged in any way in the sale of alcoholic liquors? A. No. Q. Have you any reason to suppose that the applicant is, or has been, other than a sober and temperate man? A. Yes, will in the run of a year or two get on a few days spree. Q. Do you consider this a first-class, fair, doubtful, or bad risk? A. Fair. Q. What feature in this case makes you rate it other than the best? A. For reasons just above given. Q. Do you advise the risk? Yes, or no? A. Yes. I do not think that the drinking he is given to will affect his expectancy. (If you have any hesitation in answering unqualifiedly, Yes, give the association the benefit of the doubt, and answer, No, writing a confidential letter to the medical director at the home office.)"

On February 14, 1891, the insured had applied for a policy in the sum of two thousand dollars, the application being exactly the same as the application attached to the policy for five thousand dollars, except that across the margin was written the following words, to wit: "See old application;" and indorsed on such application was the following: "To agents and examiners: Answer questions as to drinking habits explicitly; such terms as temperate, moderate, etc., will not do. Save yourself and us much trouble and delay by seeing that all questions are answered fully and precisely before sending application to the home office."

Written notices were sent by the association the insured, notifying him of the amounts to be paid and the time in which the premium should be paid, each notice specifying that the amounts therein stated must be paid within thirty days from the date of the notice. On October 27, 1892, such a notice was sent by the association and received by the insured, calling for the payment of $23.57 within thirty days from its date. On December 15, 1892, a receipt for the premium due in the

notice above referred to was sent to the insured. On December 19, 1892, the following application for reinstatement was signed by the insured and forwarded to the association: "The certificate of membership or policy of insurance issued to me by the Massachusetts Benefit Life Association, No. 37601, has lapsed and become void for non-payment of assessments; and I desire that the same may be renewed on the following terms and conditions: I hereby warrant that I am in good health, and that I fully understand that I am reinstated in the Massachusetts Benefit Life Association only upon condition that the above warrant is true; and I further warrant that the answers given and the representations made in my. original application are true, and are applicable at the present time, except ————, and to all the period since the date of said application, except ————; and I do hereby expressly agree that the acceptance of this or any subsequent payments by said association does not and shall not reinstate me in said association, if the warranties herein contained are not in each and all particulars true; and this warranty is hereby made a part of the certificate or policy above referred to." The insured at the time of his death had in his possession a notice dated January 27, 1894, showing quarterly premium due thirty days thereafter, which was marked paid February 26, 1894; and also notice of same date, referring to same premium, with no entry of payment. On February 19, 1894, a letter was written by the association to the insured as follows: "Your favor of the 13th is at hand. If you will send us your note for thirty days, to reach us on or before February 27th, we shall be glad to accept it in payment of quarterly premium due on that date." On February 21, 1894, the company wrote to the insured as follows: "Your favor of the 18th is at hand. On the following day I wrote you, addressing my letter to Atlanta, stating that we would accept your note for thirty days, if it reached us on or before the 27th. I presume you have received the letter, and that the note will arrive in due time. If, however, it did not come into your hands, and you will send us the note to reach this office by the 1st of March, we will be glad to accept it."

On February 28, 1894, the insured signed and transmitted

to the association a promissory note of which the following is a copy:  "$23.53.    Atlanta, Ga., Feby. 28, 1894.    Thirty days after date I promise to pay to the order of Massachusetts Benefit Life Association the sum of twenty-three and 53/100 dollars, with interest after date at the rate of eight per cent. per annum until paid, to be paid annually, and if not so paid, to be counted as principal, and costs of collection, including ten per cent. of principal and interest, as attorneys' fees.    Value received.    And each of us, whether maker or endorser, as to this debt expressly waives and renounces all rights to the benefit of the homestead and exemption under the constitution of 1877, and the laws passed in pursuance thereof, and of exemptions under sections 2040 to 2049 of the Code of 1882, and acts amendatory thereto, so far as may be lawfully done.    In testimony whereof this note is signed and sealed.    John M. Robinson.    Payable at Merchants Bank, Atlanta, Ga."    Indorsed, "returned unpaid."    On April 7, 1894, the company wrote the following letter to the insured :   "Your note for thirty days, of Feb. 28, is returned with the notice that you are in New York and will remit.    If you will send us within a few days the amount of the quarterly premium ($23.57), with enclosed statement of health satisfactorily filled, we shall be glad to have you do so, and we will return you regular receipt."    To the letter last mentioned the insured replied on May 5, 1894, as follows :   "I returned home to-day and received yours in regard to my note being returned, stating I would remit from New York.    I was surprised, as I thought it had been paid by some parties that owed me and promised me faithfully to pay this when it came. I've been hard up this year, as what little I had could not collect it.    I don't want to lose the policy, as I've been with you some time and like your company and want to make some arrangements to keep it up.    I have now gotten in business again, and will soon be on my feet again.    I represent now some of the best houses in the U. S.    I send you the cards of my houses that I represent.    I would be glad to arrange this matter in some way, and I will look out for breakers next time, and I don't think, after I get over this, I will trouble you any more in this way."

In reference to the quarterly premium due May 27, 1894, as well as the quarterly premium due on February 27, 1894, the following correspondence took place between Mrs. Robinson and the association: Letter from Mrs. Robinson to the company, dated May 25, 1894, as follows: "Enclosed find post-office order for $23.57, to pay quarterly premium due May 27, 1894, of John M. Robinson, Atlanta, Ga. Mr. Robinson is so often out of the city on business, he might possibly not remit in time, and I know how important it is that the matter should be attended to promptly. I have always called his attention to the matter at the time, or attended to the matter myself if he was absent. I am at present in Va. with my daughter. She is attending school at Virginia College. Please send receipt to me, as Mr. Robinson always forwards them to me." Letter from the company to Mrs. Robinson, dated May 29, 1894, as follows: "I have your favor of the 25th, and in reply to the same would say, that on the 12th day of May I wrote to Mr. Robinson, care of John Silvey & Co., Atlanta, Ga., asking for a certificate of good health, inasmuch as his policy has lapsed for non-payment, and the health certificate to be accompanied by remittance to pay for the amount due, as the note which he gave for the former payment came back to us from the bank unpaid. On receiving a reply to that letter, with the remittance accompanied, we shall be glad to give the matter its prompt attention." Letter from Mrs. Robinson to the company, dated June 5, 1894, as follows: "I was indeed surprised to learn, from your letter of May 29, that Mr. Robinson had failed to take up the note given in payment for Feb. 27. I supposed of course it had been paid, as he sent receipt. Had he apprised me of the fact at the time he made this arrangement, I would have attended to the matter myself for him. He was absent from Atlanta for over a month in Philadelphia and New York. I did not hear from him promptly, so I sent the money for the May premium. I was anxious that it should be attended to promptly. I have not yet apprised him of the fact that I have paid it—will by letter to-day. I heard from him yesterday. He also sent your letter of May 12th, in which you offer an extension on quarterly premium which expires on

May 27th.    Also sent certificate of health.    He said in his letter he would write and arrange the matter.    As I have paid the May premium, and the February is still unpaid, if you have not heard from Mr. Robinson with remittance, I ask as a favor you will credit the money sent to the Feb. dues, and if he should send also, you can then send receipt for both quarterly premiums, Feb. 27, 1894, May 27, 1894.    If you will give a short time on May premium, I will send the money.    I could do so now, but I need what I have to pay my daughter's school expenses.    I will attend to this myself after I hear from you. Mr. R. has been a little unfortunate in his money matters; times are very hard, and that is why I write you to arrange this matter."    Letter from Mrs. Robinson to the company, dated June 19, 1894, as follows:    "On June 4th I wrote you and enclosed health certificate of John M. Robinson, Atlanta, Ga., May 29, 1894, as requested by the association.    I also requested the money sent by myself to be applied to the Feb. dues, to cancel the thirty-day note given by John M. Robinson to pay the Feb. premium.    I also enclosed letter written Mr. Robinson, on May 12, 1894, offering to extend the time for payment of the May premium, if he would send certificate of health and pay Feb. dues.    I enclose to-day, June 18, postoffice order for $23.57 to pay May premium.    I regret that I could not send the money sooner.    I hope in the future nothing of this kind may occur again.    Please send receipt for the May premium, also note cancelled."    Letter from the association to Mrs. Robinson, dated June 5, 1894, as follows: "Enclosed I hand you receipt for the quarterly payment under Mr. Robinson's policy, as remitted by you, and return you the note for which your first remittance was used.    This makes the matter now all right."

The insured died on June 29, 1894.    On January 24, 1895, Mrs. Robinson brought suit against the association upon the policy of insurance issued February 27, 1891, for the sum of five thousand dollars.    The prayer of the petition was for a recovery of the principal of the policy with interest thereon, and also for attorneys' fees and damages alleged to be due on the ground that the association had acted in bad faith in re-

fusing to pay the policy. The defendant pleaded that the insured had procured the policy to be issued by false and fraudulent statements in his application, in that he had stated therein that he was not in the habit of using malt or spirituous liquors, and had never been in such habit, except as therein stated, whereas in truth and in fact he was an habitual drinker of intoxicating liquors and had suffered from delirium tremens within less than three years from the date of the policy, and that the policy would not have been issued to him if these facts had been known to the insurer; and further, that the policy had lapsed by the failure of the insured to pay the premiums due thereon, and had so remained for a long time, and that not until about thirty days prior to his death was any effort made to renew it, when he caused it to be renewed upon the delivery of a health certificate, in which he declared he was in good health, and reiterated the statements made by him in his original application in reference to intoxicating liquors, such statements being false and fraudulent, and in direct violation of the conditions on the policy. At the trial there was much evidence tending to establish the fact that the insured had been for years in the habit of getting on sprees, which increased in number during the latter years of his life, and that he had been arrested on numerous occasions for public drunkenness and confined in the "stockade." There was also evidence tending to show that this condition of affairs existed during the three years following the date of the policy, and there was some evidence that he had had delirium tremens, though on this point the evidence was conflicting. His habit as to sprees was public and notorious in the city of Atlanta, where he lived. He died in " city stockade," having been sent there for public drunkenness. His death was caused by his being placed at hard labor on a very hot day, immediately following the excessive use of alcoholic stimulants. He was well known in the community, a good business man, well thought of, and his terrible habit, known to a large circle of friends in the business community, was greatly deplored. The plaintiff recovered a verdict for the full amount of the policy, with interest thereon, and also for attorneys' fees and damages upon

the ground that the association had acted in bad faith in refusing to pay the policy. A motion for a new trial was filed by the defendant, in which error was assigned upon various rulings made during the trial. The motion was overruled, and the defendant excepted.

1. In dealing with this case the first matter to be considered arises out of questions made by the record in reference to what is commonly known as the "incontestable clause" in a policy of life-insurance. This clause in the present case is in the following words: "This policy is incontestable after three years from its date, provided three full yearly payments have been made upon it, except that error in the age of the insured is open to adjustment, and, if understated, the insured will be entitled only to the amount of insurance which the sum paid would have purchased at his correct age, if insurable in this association." The policy contains the contract entered into between the insurer and insured. The stipulations contained therein, as well as those set forth in other papers made a part of the contract by reference in the policy, must be looked to, in order to ascertain upon what terms the parties agreed, and what are the rights and liabilities of each. Such a contract, from its very nature, requires that each party should act in perfect good faith with the other. The applicant for insurance must fully and freely disclose to the insurer all facts which would, in any way, throw light on the question then under consideration by the insurer, that is, whether it would be proper to enter into a stipulation with the applicant to insure his life. On the other hand, the insurer is under a like obligation to act in good faith with the applicant in regard to all matters where there is a duty resting upon him. That this duty rests respectively upon the applicant and the insurer in reference to all contracts of life-insurance is well settled, and is fully recognized by the code of this State. All provisions of our code in reference to fire-insurance, wherever applicable, are equally the law of life-insurance. Civil Code, § 2117. In reference to fire-insurance the code provides that "Every application for insurance must be made in the utmost good faith, and the representations contained in such application are considered as

covenanted to be true by the applicant. Any variation by which the nature, extent, or character of the risk is changed will void the policy." Civil Code, §§ 2093, 2097.

These ancient and well-settled principles, applicable alike to all contracts of insurance, having their origin in a desire to promote truth and further the ends of justice, in their application in particular cases have sometimes been the cause of grave injustice and palpable wrong, especially in cases arising under contracts of life-insurance. Suits upon such policies have been defended, often successfully, upon the ground that the statements made by the insured in his application were of such a character as, under the law and the terms of the contract, the policy would be vitiated. In a number of such cases, where the courts were compelled, under the laws relating to such matters, to sustain the defense set up by the insurer, it was clearly apparent that if the objection urged after the death of the insured had been raised during his lifetime, an explanation could have been given of that which, under the strict rules of law, without an explanation, was required to be construed as a misrepresentation vitiating the contract of which it formed the basis. In many cases, no doubt, the misrepresentation would be innocent, with no intention to defraud the insurer; while in others possibly a deliberate intention to defraud might be developed. In all cases, however, the question as to whether there had been any intention on the part of the insured to perpetrate a fraud upon the insurer, and whether such scheme should be successful, was to be determined after the death of insured, when he could no longer be heard on the questions involving not only the validity of his contract, but sometimes his character as well. The insurer, having in his hands the premiums paid by the insured during his lifetime, as well as the accumulations which had been made thereon, was permitted to raise questions of this nature in a controversy between himself and the beneficiary of the policy, and was, as has been said, in many cases allowed to defeat entirely the contract entered into with the insured, when he could no longer be heard in explanation of his conduct or in vindication of his character.

The object to be secured in a contract of life-insurance to

mature at the death of the insured being a provision for his family, or for some person who has an insurable interest in his life, and the result in litigated cases with insurance companies being in many instances construed by the public to be simply a declaration, in effect, that the insured had paid for long years, at great sacrifice to himself, large sums in premiums, for the sole purpose of having it judicially ascertained after his death, when his voice could no longer be heard, that he had made a statement the effect of which was to declare his contract void, the insurer thereby becoming the beneficiary of his earnings, instead of those for whom it was intended, the effect of such cases, no matter how honestly defended on the part of the insurer, was to create the impression upon the public mind, that a contract of life-insurance was a one-sided affair and was simply a scheme on the part of designing individuals and corporations to secure to themselves the earnings of others under a supposed contract for the benefit of some one in whom the insured was interested, but who was never really benefited by the contract.    This prevailing impression interfered to a great degree with the whole business of life-insurance, affecting alike the insurer who was unscrupulous in his methods, as well as the insurer who desired to act, and who had in the past acted, in perfect good faith with his policy-holders, and was calculated to make people, as a rule, indisposed to enter into contracts of life-insurance.    The consequence was that the insurers, in order to increase their business, and to induce those who, on account of their observation in regard to cases where life-insurance policies has been declared void after the death of the insured and after all premiums had been paid, were uneasy about the result which might be reached in case they insured their lives, were compelled to offer to the public a contract which would, to a large extent, remove these objections which had become so well settled in the public mind.    Such was the history and origin of what is called the "incontestable clause."

The contract entered into between the insurer and the insured in the "incontestable clause" is, in effect, that the insurer says on his part, pay me your premiums according to the terms

of the contract, and I will pay at your death to the beneficiaries named in the policy the amount thereof, without regard to the statements which you made in your application, whether they be true, or whether they be false. Under such a contract the policy may be either absolutely incontestable, or it may be incontestable as to all matters of defense except such as are reserved in the policy. Such a policy may be incontestable from the very moment it is issued, or it may be incontestable after the lapse of a certain time after its issue. Such being the classes of incontestable policies, the question now arises: How far can such contracts be sustained by the law? Where the incontestable clause provides that the policy shall not be defended on any ground except such as would amount to a fraud in the procurement of the policy, such a stipulation will be binding upon the parties, even though it was to take effect from the moment the policy was to be issued. Such was the view of the Court of Exchequer in the case of Wood v. Dwarris, 25 L. J. Exch. (N. S.) 129–131, where it was held, that when an insurer holds out to the public that its policies shall be "indisputable" except in case of fraud, and the policy is effected upon the faith of that representation, the insurer is barred in equity from saying that the application for the policy stipulated that if it contained any untrue statement the policy should be void, and that it did contain such a statement. In the trial of this case Baron Martin remarked: "You have no right to set up such a defense as this, after having stated that you will not dispute except in cases of fraud."

A policy providing generally that it should be incontestable from its date, but silent on the subject of defending upon grounds originating in fraud, would still be a valid contract; the waiver of the right to defend on the ground of fraud not being the subject of express stipulation, the law would imply that the insurer intended to reserve to himself the right to defend upon that ground. If, however, the policy stipulated that it should be incontestable from its date, and the insurer should not be allowed any defenses, whether originating in fraud or otherwise; or if it were clear from the terms of the contract that it was the intention of the parties that fraud should not be a defense,

then such a contract would be void as being opposed to the policy of the law. Bliss on Life Ins. (2d ed.) §§ 254–255. But what is the legal effect of a contract of life-insurance where it is stipulated that it shall become incontestable after the lapse of a specified period from the date of its issue, and that this incontestability shall apply to all defenses, whether originating in the fraud of the applicant or not? Such is the character of the stipulation in the present case, with the exception as to age, set out in the clause quoted supra. While it is true that fraud voids all contracts, it is equally true that it is competent for the lawmaking power to fix a definite time in which an action shall be brought to declare a fraudulent contract void, and a failure on the part of the person defrauded to bring such action within the time designated would have the effect of debarring him from the right to set aside such a contract. While in such cases it is generally provided that the limitations so fixed shall not begin to operate in favor of the party who has committed the fraud until the same has been discovered, the duty is placed upon the party who seeks to avoid the contract on the ground of fraud to make such efforts to discover the fraud as would amount to ordinary diligence in law. Civil Code, §§ 3669, 3711, 3785; *Little* v. *Reynolds*, 101 *Ga.* 594, and cases cited.

As the law may prescribe such a limitation in which actions shall be brought by the party to be affected, it is also within the power of the contracting parties to agree among themselves upon a period of time which would amount to a statute of limitations, either greater or less than the period fixed by the law. *Western Union Tel. Co.* v. *James*, 90 *Ga.* 254; *Brown* v. *Sav. Ins. Co.* 24 *Ga.* 97; *Phenix Ins. Co.* v. *Melson*, 97 *Ga.* 723; *Ritch* v. *Masons Acc. Asso.*, 99 *Ga.* 112. The period fixed by law being intended for the benefit of the parties interested in the contract, and for their protection, it is competent for them to stipulate that the time which the law gives them to act shall be shortened on the one hand, or lengthened on the other. Parties interested in the contract may waive the benefit of the statute of limitations fixed by the law, the effect of the waiver being either to make a longer or shorter period than the law prescribes. What is said above would seem, however, to be

subject to the qualification, that where the effect of the contract would be to vitalize, by the lapse of time fixed in the contract, an undertaking which would otherwise be void for fraud, the time fixed in which the party would have a right to rescind the contract on account of the fraud must be such a time as that by the exercise of ordinary diligence the same could have been discovered. If the period so fixed is sufficient for the person, by the exercise of that care and diligence which an ordinarily prudent person would give to his own business, to ascertain whether a fraud has been perpetrated upon him, then the contract would be valid and would be enforceable after the period had elapsed in which discovery of fraud, if any existed, was to be sought; and even if actual fraud had been perpetrated, the party who was the victim of such fraud would be debarred of this defense. Where parties enter into a contract which from its nature affords an opportunity to one party to perpetrate a fraud upon another, and it is stipulated therein that the party who is liable to be defrauded shall have a specified time in which to make inquiry as to the acts and conduct of the other party, he is on notice by the very terms of the contract itself that fraud may be involved in it, and the duty is upon him to commence at once an investigation into the acts, conduct, and representations of the other party; and if the time fixed is such that the information which would show that the fraud had been perpetrated could have been, by the exercise of ordinary diligence, obtained, then the parties are bound by their contract as to time, and after the lapse of that time, fraud is no longer a defense. This does not violate in any way the well-settled principle, that fraud is to be abhorred, vitiates everything it touches, and the person guilty of it is not to be countenanced in any way by the courts. While all this is true, it is equally well settled that a contract which has for its foundation a wilful fraud may become vitalized and enforceable by the negligence of the party who was the victim of the fraud.

The question now under discussion has been the subject-matter of very few adjudicated cases, there being only one, so far as we have been able to find, where the question was directly involved and decided. In the case of Wright *v.* Mutual Benefit

Life Association of America, 50 Sup. Ct. Rep. N. Y. (43 Hun), 61, the court had under consideration a suit upon a policy of life-insurance in which it was stipulated, that "if any misrepresentation or fraudulent or untrue answers or statements have been made, or if any facts which should have been stated to the association have been suppressed therein . . then, in either event, such agreement shall become null and void, and all moneys which shall have been paid shall be forfeited to said association for its sole use and benefit." Upon the back of the policy printed in large type was the following stipulation: "No question as to the validity of an application or certificate of membership shall be raised unless such question be raised within the first two years from and after the date of such certificate of membership, and during the life of the member therein named." The insured having died, the association refused to pay the policy, upon the ground that the representations and warranties contained in the application were fraudulent; and upon a suit filed to enforce the contract, the defendant offered to show that the insured, when the application was made, was afflicted with certain diseases which were among those enumerated in the application, and that he stated therein that he was not afflicted with any of them. A verdict in favor of the plaintiff was directed. On appeal the Supreme Court, general term, held that there was no error in the rulings of the trial judge; that the language providing that "no question as to the validity of the stipulations should be raised" was intended to and did create a short statute of limitations in favor of the insured, within which limited period the insurer must contest, if ever, the validity of the policy; that it was broad enough to exclude a defense founded on fraud; and that such a stipulation was not void as against public policy. Follett, J., in the opinion says: "The language 'no question as to the validity' is, in terms, broad enough to exclude the defense sought to be established. The remaining question is, whether the provision so construed contravenes any rule of public policy, and is for that reason void. The stipulation provides that the validity of the policy shall not be questioned after the death of the insured; and not after two years from the date of its issue. An action for the recov-

ery of the sum insured not being maintainable until after the death of the insured, one effect of the stipulation, if valid, is to prevent the insurer from interposing as a defense the falsity of the representations of the insured.　But its effect is not to prevent the insurer from *annulling the contract* upon the ground of the fraudulent representations of the insured, provided an action for that purpose is brought in the lifetime of the insured, and within two years from the date of the policy.　The practical and intended effect of the stipulation is, as held by the trial court, to create a short statute of limitations in favor of the insured, within which limited period the insurer must test, if ever, the validity of the policy.　It is settled that a stipulation in a policy limiting the time within which an action may be brought thereon, is not against public policy, and that an action begun after the stipulated time can not be maintained. [Citing cases.]　If a stipulation shortening the period within which the statute permits the insured to enforce his rights in the courts is not against public policy, it is difficult to see upon what ground a stipulation shortening the time which the statute and the rules of the common law give an insurer to enforce its rights in the courts can be held to contravene public policy. . . A stipulation like the one under consideration ought to be an incentive for the insurer to exercise vigilance and good faith in investigating the truth or falsity of the representations upon which the policy is issued while the matter is fresh.　The witnesses are all alive, and the exact truth can, if ever, be ascertained, and the stipulation prevents the insurer from lying by and receiving the premiums during the life of the insured, and after his death, when the good faith and truth of his representations can not be supported by his oath, contesting the policy on the ground that the insured's representations were false or untrue.　Such a stipulation is neither unreasonable nor contrary to public policy."　This decision was affirmed by the Court of Appeals (118 N. Y. 237), Potter, J., in the opinion saying: "No doubt the defendant held it out as an inducement to insurance by removing the hesitation in the minds of many prudent men against paying ill-afforded premiums for a series of years, when in the end, and after payment of premiums, the

death of the insured, and the loss of his and the testimony of others, the claimant instead of receiving the promised insurance may be met by an expensive lawsuit to determine that the insurance which the deceased has been paying for through many years has not and never had any existence except in name. While fraud is obnoxious and should justly vitiate all contracts, the courts should exercise care that fraud and imposition should not be successful in annulling an agreement, to the effect that if cause be not found and charged within a reasonable and specific time, establishing the invalidity of the contract of insurance, it should thereafter be treated as valid.   Hence I fail to perceive any error in the disposition made of this question in the court below."

As the terms of the incontestable clause in the present case were broad enough to exclude the defense of fraud, and as the time fixed in which the fraud must be discovered, if any had been perpetrated, was three years, and as this is beyond question a reasonable time, we feel no hesitancy in holding that the contract was valid, and that there was therefore no error in the ruling of the court below, that the insurer could not set up as a defense to a suit on the policy any ground growing out of misrepresentation or concealment, although amounting to a fraud, after the policy had been in force three years and three full yearly payments had been made thereon, there being no question of misrepresentation as to age.   The present case is one peculiarly appropriate for an application of these principles.   The very matter now set up to defeat the policy, that is, habits of drunkenness of the insured, was so public and notorious in the city in which he lived, that it is manifest from the record that a letter addressed to any prominent business man or any city official, at any time between the date of the first application for insurance to the date of the death of the insured, would have disclosed practically the state of affairs now shown to have existed.

There being no evidence before the trial court as to what the law of Massachusetts is as to contracts like the one in question, it will be presumed that the common law is of force there on the subject.   *Railroad Company* v. *Lacy*, 43  *Ga.* 461 ;.

*Pattillo* v. *Alexander*, 96 *Ga.* 60.  There being nothing in the common law which would invalidate the contract, and it being consistent with the law of Georgia to give it effect, it will be enforced in the courts of this State.

2. It was contended, that even conceding the incontestable clause to be valid, still under the terms of the policy in the present case the insurer was not debarred from taking advantage of other defenses which it is claimed were embraced in the policy.  The policy stipulated that "death of the insured in consequence of the use of intoxicating liquors, or narcotics, or by his own hand or act, whether sane or insane, whether the act be voluntary or involuntary, is a risk not contemplated or covered by this contract, and against which this association does not insure"; and that if "the insured shall fall into the habit of becoming intoxicated, or into the habitual use of narcotics, or shall have delirium tremens within three years from the date hereof, then this contract shall be void, and in such event the insured hereby authorizes and directs the association to cancel this contract and return to him the sum of all payments made thereon, which sum he agrees to accept for himself, his heirs or assigns, in full and complete settlement of all liability of said association under this contract."  The contract as contained in the policy must be construed as a whole, so that, if possible, each stipulation shall be made consistent with the others, and the whole allowed to stand.  If, however, the clauses in the contract are of such a nature that they conflict with each other, then that interpretation must be placed upon the writing which would be most favorable to the insured.  In the case of National Bank *v.* Insurance Co., 95 U. S. 673, it was held that, "the policy having been prepared by the insurers, it should be construed most strongly against them."  In Thompson *v.* Insurance Company, 136 U. S. 287, 297, Mr. Justice Harlan says: "If the policy is so drawn as to require interpretation and to be fairly susceptible of two different constructions, the one will be adopted that is most favorable to the insured."  Construing the above-quoted clauses of the policy in connection with the incontestable clause, it would seem a proper interpretation of the three clauses as a whole, that those

things which were declared to be acts which would vitiate the policy were such as occurred within three years from its date, and that they should be valid and sufficient reasons for rescinding the contract and canceling the policy at any time within the period provided for. This would be a fair interpretation of the contract, and would appear from the terms of the paper to be the intention of the parties to it. But even if this were not true, and if the presence of the other two clauses raises a doubt as to whether they are consistent with the incontestable clause, as it is to be presumed that the incontestable clause was placed in the policy for the benefit of the insured, the doubt as to the intention of the parties must be resolved by giving it a construction which would make that clause the controlling one. It seems to us that, interpreting the policy fairly and reasonably according to its terms, it was the intention of the parties that all grounds of defense, which by the exercise of ordinary care could have been discovered within three years, are intended to be cut off by the incontestable clause. We think this view is abundantly sustained by the authority above cited, and also supported by reason. There can be no doubt that the interpretation which is placed upon every policy of the character of the one under consideration by the holder is, that after the lapse of the period fixed, the policy is to be free from defenses. It can be asserted with equal confidence that the fact that the holder in each case so understands is well known to the insurer. The incorporation into the policy of subsequent clauses which produce doubt and make the policy difficult of interpretation will not have the effect of relieving the insurer of the burden that is placed upon him by the rule which requires that the clauses in the policy "should receive the construction the insurer had reason to suppose was put upon them by the insured." Wadsworth *v.* Jewellers & Tradesmen's Company of New York, 132 N. Y. 540; May on Ins. § 174.

In Simpson *v.* Life Ins. Co., 20 S. E. Rep. (N. C.) 517, the defendant agreed that "all restrictions of travel, occupation, or residence, expressed in the original policy," should be waived, and that the "policy should be, from the date of that agreement, incontestable," and it was added that when the policy

became a claim "the amount of insurance" should be paid to the beneficiary upon proof of death. The insured died, and claim was made for the full amount of the policy. The company refused to pay this amount, claiming that it had a right to discharge its liability by the payment of a less sum, which was stipulated in the original policy to be paid in the event of the breach of certain conditions. The court held that under the incontestable clause this could not be done. Burwell, J., in the opinion says: "The quality of incontestability could with no propriety be predicated of this contract of insurance if it was still allowed to the insurer to dispute its liability to the insured for the 'amount of the insurance' upon the ground that the death was caused 'by the use of intoxicating liquors, or by opium, or from the violation of law, or any condition or agreement contained in this policy, or the application upon which this policy is issued.' And yet, if it may now, under its contract, contest with this beneficiary as to its liability for the amount of the insurance, upon the allegation that the deceased committed suicide, it may contest with beneficiaries under other similar contracts upon the grounds enumerated above. If this can be done, the policy is certainly not incontestable, for the whole field of dispute would then be open to the defendant." In Goodwin v. Provident Savings Life Assurance Society, 66 N. W. Rep. (Iowa), 157, the application for insurance stated that the death of the insured by his own hand was a risk not assumed by the association, and the policy declared that a claim thereunder by death occurring two or more years after its date would be incontestable except for fraud in procuring it. The court held that the society was liable in case of death by suicide occurring two or more years from the date of the policy. Deemer, J., in referring to the conflicting provisions of the policy, said: "We have a case, then, for construction of these seemingly ambiguous and conflicting provisions. The tenets established for the guidance of courts in such matters are well understood, and no one is better established than that in all cases the policy must be liberally construed in favor of the assured, so as not to defeat, without a plain necessity, his claim for indemnity. And when the words used may, without violence,

be given two interpretations, that which will sustain the claim and cover the loss should be adopted." In Mutual Reserve Fund Life Association *v.* Payne, 32 S. W. Rep. (Tex.) 1063, where the court had under consideration a contract of insurance, where one clause in the policy provided that if a certificate should be in force five years it should thereafter be incontestable for any cause except for non-payment of dues," and it was also provided in another clause that if the insured died by his own hand, whether voluntary or involuntary, sane or insane, the association would not be liable, it was held that the suicide of the insured after the policy had been in force five years would not relieve the company from liability. It has, however, been held that the incontestable clause does not have the effect of doing away with clauses in the policy merely regulating the remedy to be pursued by the person entitled to sue thereon, and that if the policy stipulated that action should be brought thereon within six months from the death of the insured, there was no such inconsistency between this and the incontestable clause as would render the clause in regard to the time in which the suit should be brought inoperative. Brady *v.* Prudential Ins. Co., 32 Atl. Rep. (Pa.) 102. It would seem therefore to be the rule, that in regard to every matter which would have the effect of defeating or destroying the contract, the incontestable clause would be controlling, and stipulations in the policy to the contrary must yield, and that provisions in regard to remedies and conditions to be performed before suit is brought, and like conditions merely affecting the remedy to be pursued upon a valid contract, would not be affected by the clause as to incontestability.

3. On October 27, 1892, the insured was notified that a premium was due on the policy within thirty days from that date. The premium was not paid within the time specified. The record shows, however, that the premium was paid and a receipt for it issued by the association on December 15, 1892. This is all that appears in regard to the matter of payment, or the circumstances under which the payment was made. That the insured was in default is clear, because the premium was not paid on the date when due; that he subsequently paid the premium, and that the company treated it as paid and re-

ceipted him for the same, is equally clear.   As a general rule, the receipt by the insurer of the premium after maturity is a waiver of the forfeiture which would otherwise take place; and this is true even though the payment be made to an agent of the insurer, who does not disclose to his principal when transmitting the amount collected that it has been paid by the insured after the premium was due.   Bliss on Life Ins. § 194.

But it is contended by the defendant, that the policy had lapsed, and that the payment of the premium on December 15, 1892, and the health certificate dated December 19, were a part of one and the same transaction, and that the reinstatement took place upon the performance by the insured of two conditions, that is, payment of the premium, and furnishing the health certificate, the difference in the dates being due to the fact that the premium was received immediately on the day that the contract of reinstatement was entered into, but that the health certificate was subsequently forwarded.   There is no evidence to this effect, but it is claimed that such a state of facts is necessarily to be inferred from the existence of the two papers usual in such transactions bearing date within a few days of each other.   If the health certificate bore date before the premium receipt, the inference might be as contended for.   The defense rests upon a forfeiture.   Forfeitures are not favored by the law, and if it were allowable to establish them by inference alone, certainly they can not be established by inferences antagonistic to the presumption arising from an admitted writing of the person setting up the forfeiture.   It is further contended, that the health certificate contained statements which were untrue in regard to the health of the insured, that the reinstatement had taken place upon the faith of the certificate, and, being thus procured by fraud, was void. The question as to whether the reinstatement had been procured by fraud was submitted to the jury.   There was evidence, as is above shown, which would require the jury to find that there had been no lapse, the payment and the receipt of the premium on December 15 being a waiver of the right to treat as a forfeiture the failure to pay on November 27.   There was also evidence which would have warranted the jury in

finding that no statement in the health certificate would amount to a misrepresentation and vitiate the reinstatement on account of fraud. The court charged the jury that there was a lapse, and submitted the case to the jury on the question as to whether the reinstatement had been procured by fraud. On this issue, as we have seen, there was evidence sufficient for the jury to find for the plaintiff. In either view of the matter there is nothing in the exception under consideration to authorize the granting of a new trial. If there was no lapse, the verdict on this issue was demanded by the evidence; if there was a lapse, there was evidence to authorize a finding that a reinstatement had taken place, and the insured was again a member of the association, with all of the rights that he had before the lapse. It is true it has been held that a reinstatement makes a new contract, but the old contract is looked to for the terms, conditions, and stipulations of the new contract. The old contract in the present case being that the policy should be "incontestable after three years from its date," upon the payment of three annual premiums, the new contract (there being neither in the application for reinstatement nor the original policy anything to the contrary) would be governed by the same terms, and the period of incontestability would be reached three years from the date of the original policy, notwithstanding the fact that one of the sums necessary to make up the three annual premiums required to be paid had not been paid at maturity and a lapse and reinstatement had taken place. The failure to take advantage of the right of forfeiture and the consent for reinstatement restores the original contract in all its vigor. Especially is this true where there was no notice of any character to the insured that such a radical change in his contract would be brought about by a lapse and reinstatement.

4. The insured received a notice on January 27, 1894, that the quarterly premium would be due thirty days thereafter, and it appears from the record that this notice was marked paid on February 26, 1894. It also appears that he had notice of a sum due referring to the same premium, but upon which there was no entry of payment. On February 19, the insured

had a letter from the association, in which it was stated that if a note for thirty days was sent it on or before February 27, it would accept the same "in payment of quarterly premium due on that date." The note was not sent before February 27, and another letter from the association stated that if the note was sent by the 1st day of March it would be accepted. On February 28, the insured signed and transmitted to the association a note for the premium, copy of which is set out above. It seems that this note was not paid at. maturity, and a correspondence followed between the association and the insured and his wife in reference to this note and the quarterly premium due on May 27. An examination of the correspondence, which is set out in the statement of facts above set forth, will show that both the February and May premiums were paid. There was sufficient evidence in the record in this correspondence for the jury to find that the note of February 28 was accepted by the insurer as payment of the premium. There was a sufficient amount forwarded by Mrs. Robinson to pay the May premium before it was due. It appears that when the association received this remittance, Mrs. Robinson's attention was called to the fact that the note was unpaid, and at her request the association appropriated the amount which had been remitted by her for the May premium to the payment of the note given for the February premium, and then extended to her an indulgence in the matter of the May premium. The note was payment of the February premium; the cash remitted was payment of the May premium, and when received by the insurer it extinguished the liability on that account. When with the consent of Mrs. Robinson the money which had been sent to pay the May premium was used by the association to pay the February note, upon the express condition that she should have further time to pay the May premium, that the May premium was not actually paid until after it was due would not cause the policy to lapse. So it would seem clear that there had been no such default in the payment of either the February or the May premium as would cause the policy to lapse. The February premium was paid by the acceptance of the note in payment of the premium. The May premium

was paid by the cash remitted for that purpose, and received by the association with directions to so apply it. That afterwards a transaction was entered into between the association and the wife of the insured, by which the money used to pay the May premium was appropriated to pay the February note, and the May premium was thereafter again paid in cash, would not cause a lapse in the policy, because there was no default. The money subsequently forwarded by the wife of the insured in payment of the May premium was in effect a payment of the note. There being no such default in the payment of these premiums as would cause a forfeiture of the policy, there was no necessity for the reinstatement, and therefore the health certificate was unnecessary. While it is true as a general rule that a promissory note is not payment of a debt which it represents, until it is itself paid, still it becomes payment of the same when the parties by express stipulation so agree. The correspondence in reference to the note given for the February premium furnishes sufficient evidence to show that such was the intention of the parties to this transaction in reference to the note. The note having been accepted in payment of the premium, it would seem that it became then a separate and independent transaction and had no further relation to the contract of insurance. Especially would this be true in the present case, where there was no stipulation in the note that the contract should become forfeited upon failure to pay the note at maturity. See May on Ins. § 345 E; Joyce on Ins. § 1202.

5–8. If there was a lapse of the policy, growing out of the failure to pay the premiums due on October 27, 1892, February 27, or May 27, 1894, and a reinstatement was necessary on account of any of these lapses, and such reinstatement was secured by a certificate furnished by the insured, in which there was a statement that he was in good health, and such statement was false and so material that his conduct would amount to a fraud, then the effect of the fraud would be to render his reinstatement void, and the policy would remain lapsed. If, however, there had been no lapse, the statements in the health certificate would be immaterial and irrelevant. As the court instructed the jury that there was a lapse in 1892, and as it is

possible that they might have believed that there was also a lapse in 1894, their finding in favor of the plaintiff was in effect a holding that the statements made by the insured in his applications for reinstatement were, however false, immaterial. Counsel for defendant contended that it was erroneous to submit to the jury the. question of the materiality of these representations, and that it should have been decided by the court. In support of this, they refer to that clause in the policy which declares, in substance, that the place of the contract is the City of Boston and that it is to be governed and construed only according to the laws of the State of Massachusetts. While it is true that under this statement in the policy the contract becomes a Massachusetts contract and is to be dealt with in the same manner as if it had been executed in that State, the laws of that State have that force and effect only in this State which they are declared to have in the constitution of the United States or which is recognized by this State in accordance with the comity of States. Pol. Code, § 9. Whenever a contract made in a place outside of the territorial jurisdiction of this State is sought to be enforced in this State, courts here will enforce the contract and give effect to the laws of the place in which it was executed, so far as that can be done without violating the law of this State or its established policy. In such cases the laws of the State in which the contract is executed determine the "validity, form, and effect" of the contract which is sought to be enforced. Pol. Code, § 8. There being nothing in the contract in the present case which is violative either of the law or the public policy of this State, and it not being contended it in any way violates the laws of the State of Massachusetts, this court will deal with the same as a Massachusetts contract, and will uphold it as valid in substance, sufficient in form, and to have the same effect as between the parties which it would have under the laws of that State. It is one thing for the courts of a State to recognize and give effect to the laws of another State in reference to the validity, form, and effect of contracts, and an entirely different thing to so deal with the laws of such State relating to the procedure and the remedies on a contract sought to be enforced in the former State. The comity of States de-

mands that we recognize a Massachusetts contract as valid when it is so under the laws of that State, but there is no comity which requires that the procedure in the courts of this State conform to the procedure in the courts of that State simply because by comity we are enforcing a contract either executed there or by its terms to be so treated.

That the lex loci controls as to the validity, form, and effect of the contract, and the lex fori as to the remedies thereon, is simply a statement of elementary law. The courts of the State of Georgia will recognize this contract as a valid contract, because it appears to be such under the laws of Massachusetts and is clearly such under the laws of this State, but will give the plaintiff and the defendant respectively, for the purpose of enforcing it on the one hand or defeating it on the other, such remedies only as are given to other persons who sue or are sued in the courts of this State. It is immaterial, therefore, for us to consider what is the law of Massachusetts in reference to the tribunal, or what part of the tribunal, that determines the materiality of the misrepresentations relied upon to defeat a contract of insurance which is the subject of a suit in this State. These are questions which each State is entitled to decide for itself, and to that end erect tribunals and lay down rules of procedure therein. The law of Georgia can declare what questions shall be passed upon by the court and what questions shall be passed upon by the jury. Persons seeking either to enforce or defeat contracts made in another State with citizens of this State, when they sue or are sued in the courts of this State, have no right to say that the tribunal fixed by its laws is not satisfactory to them and to demand a tribunal erected in accordance with the law of the State in which the contract is made. See Dicey on Conflict of Laws, 711; Story on Conflict of Laws (8th ed.), §§ 556, 557, 558. This doctrine is fully recognized in the case of *Joice* v. *Scales*, 18 *Ga.* 725, and in *Toomer* v. *Dickerson*, 37 *Ga.* 428. In the latter case Judge Warner in the opinion lays down the principle clearly as follows: "It was further insisted in the argument, that although the bond was executed in Georgia, it was intended to be, and was in fact, a South Carolina contract, and as such should be governed by

the laws of the latter State in its enforcement in the courts of this State. Conceding ex gratia that it is a South Carolina contract, the plaintiff seeks to enforce it in the courts of this State. Neither the validity nor the construction of the contract is questioned. The only controversy between the parties is as to the remedy upon that contract in the courts of this State. The question here is, can the creditor enforce his remedy against the security upon his South Carolina contract in the courts of this State, in accordance with our laws regulating that remedy? We give to him the same rights and remedies in our courts, for the enforcement of his contract, as we give to our own citizens; no more, no less. Mr. Justice Story states the rule correctly when he says: 'Whenever a remedy is sought, it is to be administered according to the lex fori, and such a judgment is to be given as the laws of the State, where suit is brought, authorize and allow, and not such a judgment as the laws of other States authorize or require.' Story's Conflict of Laws, 954, § 572; Dela Verga v. Vienna, 20 Eng. Com. Law Rep. 387; Whittemore v. Adams, 2 Cowen's Rep. 626. When a party comes into the courts of this State to enforce his remedy upon his contract, that remedy will be enforced in accordance with the laws of this State regulating that remedy, and not according to the remedy provided for the enforcement of similar contracts in the State of South Carolina, although the contract may have been made in the latter State." See also *South Carolina Railroad Co.* v. *Nix*, 68 *Ga.* 572. As it has been held by this court in the case of *Phœnix Ins. Co.* v. *Fulton*, 80 *Ga.* 224, that it was proper to submit to the jury the question as to whether or not a misstatement made in the application for a policy of fire-insurance was material and would have the effect of avoiding the policy, and this being, as long as that decision stands, the established procedure to be followed in such cases, there was no error in the present case in submitting to the jury the question of the materiality of the misrepresentation alleged to have been made by the insured in his application for reinstatement.

9. The error assigned in one of the grounds of the motion for a new trial is upon the refusal of the court to admit in evidence the following letters:

"Atlanta, Ga., Feb. 16, 1891.    Dr. Samuel G. Dutton, Medical Director, Mass. B. L. Asso., Boston, Mass.    Dear Sir, — I write this note to you in explanation of some questions in the within application, viz. John M. Robinson.    You will see, regarding his habits, that he gets on an occasional spree.    Mr. Robinson is not a chronic drinker, but has in years gone by drank occasionally.    I said in the application a fair risk, but in reality he is a first-class risk, and I merely make the difference on account of his past habits, as it has been several years since he drank at all.    You can accept him in safety, as he is physically A number one, and will doubtlessly live his expectancy.    Yours respectfully, C. C. Greene, Medical Examiner."

"Boston, Mass., Feb. 25, 1891.    To J. A. Burney, Agent M. B. A.    Dear Sir, — Our medical department requests additional information upon the following point in the case of John M. Robinson : How long since the drinking habit was abandoned ?

G. A. Litchfield, Secy.

"Return this letter with answer below.    Answer here."

"Atlanta, Ga., Feb. 22, 1891.    About two years.

C. C. Greene, Medical Examiner."

It was agreed by counsel for the plaintiff that the letters should be admitted in evidence as the testimony of Greene, and should have the same effect as if he had been sworn as a witness in the case; and that if he would have been allowed as a witness to have answered questions which would have elicited the information which was contained in the letters, the letters should be admitted as his testimony.    It was contended by the counsel for the defendant, as one of the clauses in the policy declared that "no agent of this association is authorized to make, fill up, or alter any such application; in doing any such act he shall be taken and considered as the agent of the applicant and not of the association," and provided that in certain contingencies a private letter should be written by the medical examiner to the association, that Dr. Greene was the agent of the insured in filling up the blanks in the application and writing the letters, and that therefore his declarations were admissible against the insured and those claiming under him.    If the effect of the stipulation was to make Dr. Greene

agent of the insured, his agency terminated when the blanks were filled up and the applicant signed the paper. Certainly it was not in contemplation of the applicant, the insurer, or of Greene, that he should continue to be the agent of the applicant to write letters to the association in regard to the application. That the insured did not consider him his agent for this purpose would seem to be clear; that the insurer did not is equally clear. The letters called for in the application were to be without the knowledge or acquiescence of the applicant, and such matters as an agent would write to his principal. That Greene did not so consider himself is equally evident from the way in which the letters were signed. If Greene was not the agent of the insured, the evidence was irrelevant; and in either event it was properly excluded. Dealing with the case as we do, and giving full effect to the incontestable clause, it would seem that the declarations made in the letters, even if admissible in evidence, would have been immaterial. Certainly the declarations made in these letters could have had no greater effect than if they had been made by the applicant himself under the same circumstances which surrounded Dr. Greene when he made them. If accompanying or following the application the insured had written a letter stating in regard to himself exactly what Dr. Greene has stated in the letters, this would not have relieved the association from the duty resting upon it to inquire into the truth or falsity of all the statements made by the insured in the application or otherwise, nor have prevented the policy from ripening into an incontestable policy after the lapse of the period fixed in the contract for that purpose.

10. Error was assigned upon the following charge : " In this application for reinstatement John M. Robinson says : 'I hereby warrant that I am in good health, that I fully understand that my reinstatement in the Massachusetts Benefit Association is only on condition that the above warrant is true.' The defendant contends that the warrant was not true, and that he was therefore never reinstated, that is, that his rights under the policy were never restored to him, but that, the condition being not true, he would not be entitled to recover. Well, he warrants in this application that at that time he was in good

health; and if you find that the warrant was not true, from the evidence, then the plaintiff in this action would not be entitled to recover, because Mr. Robinson said that he understood that he was reinstated in the Massachusetts Benefit Life Association only on the condition that the warrant is true. You will understand by 'good health,' in this connection, that state of health which his original application disclosed to the company. If he was in that state of health, then that would be a compliance as to this warrant, and, so far as that clause of defendant's plea is concerned, the plaintiff would still be entitled to recover." The objection urged to this charge was, that it limited the effect of the warranty in the application for reinstatement, that the insured was in good health, to a warranty that his health was the same as it was at the time that the application was made for the policy. We can see no objection to this charge. Such must have been clearly the meaning of the insured when he signed the application, and such undoubtedly must have been the interpretation placed upon that term by the insurer. We reach this conclusion from reasons dictated by common sense. The warranty in the application for reinstatement simply was that he was in that state of health that was good, relatively to him; that there had been no material change in his health between the date of the application for the policy and the date of the application for reinstatement. It would be unreasonable to hold that the term "good health" in such an application meant that a man who in 1891 had an infirmity which was disclosed to the insurer, was in 1892 entirely restored and a *perfectly sound man.* Good health is a relative term, and the warranty in the application for reinstatement by the insured that he is in good health can not be otherwise construed than as meaning, "I am now in practically the same health as when you undertook to insure my life." See Seiverts *v.* National Benefit Association of Minneapolis (Iowa), 64 N. W. 671, 673, and authorities there cited; Manhattan Life Ins. Co. *v.* Carder, 82 Fed. Rep. 986, and authorities there cited.

11. We do not deem it necessary to deal specifically with all of the numerous questions made in this voluminous record. We have dealt with all that it seems to us require treatment

at length. There was no such error, either in the charges or refusals to charge, or in the admission or rejection of evidence, as would require the granting of a new trial; and after a laborious and painstaking consideration of the record and the many questions involved, we have reached the conclusion that if any error was committed, it was either in favor of the defendant, or it was of such a nature as would not require the granting of a new trial.

12. While we do not think a new trial should have been granted, we are of the opinion that there was no evidence to authorize that part of the verdict finding in favor of the plaintiff certain amounts as attorneys' fees and damages. We think that the plaintiff was entitled to recover on the policy, and the jury were justified in so finding, and the judge committed no error in refusing a new trial; still we can not say that the record discloses that the defendant acted in bad faith, either in submitting the questions involved in this case to the adjudication of the trial court, or, upon being unsuccessful there, in bringing the case to this court. Some of the questions involved in this case are for the first time adjudicated in this State. They are not such questions as can be said to be easy of solution. Under such circumstances it can not be said that a resort to the courts by the defendant to have these questions determined was unreasonable, and a penalty for bringing the case into court can not, with any propriety, be imposed upon the defendant, when the law of this State says that a penalty shall be imposed only in cases where the defendant has acted in bad faith. The judgment of the trial judge in overruling the motion for a new trial is affirmed; and direction is given that so much of the verdict of the jury and judgment of the court as refers to attorneys' fees and damages be written off from the same, and that when this is done the judgment stand in favor of the plaintiff for the principal and interest due upon the policy, the costs of this writ of error, and all costs in the court below which have accrued since the rendition of the verdict, to be taxed against the defendant in error.

*Judgment affirmed, with direction. All the Justices concurring.*