SAINT PAUL–MERCURY INDEMNITY COMPANY, Appellant,

v.

Calvin T. RUTLAND, doing business as Rutland Contracting Company, Appellee.

No. 15184.

United States Court of Appeals Fifth Circuit.

Aug. 24, 1955.

Rehearing Denied Oct. 3, 1955.

Motion to Vacate and for Rehearing Denied Nov. 1, 1955.

R. Emerson Gardner, Atlanta, Ga., and James B. Donovan, New York City, James E. Clark, Birmingham, Ala., J. Carlisle DeHay, Jr., Dallas, Tex., amici curiae, for appellant.

Thomas B. Branch, Jr., Atlanta, Ga., J. A. McCurdy, Decatur, Ga., for appellee.

Watters & Donovan, New York City, for Association of Casualty and Surety Companies.

A. Walton Nall, Atlanta, Ga., Nall, Sterne, Miller, Cadenhead & Dennis, Atlanta, Ga., of counsel, amicus curiae.

Before RIVES and CAMERON, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge.

This appeal was originally submitted to a panel consisting of Judges Holmes, Borah and Tuttle. A majority and a dissenting opinion were filed, but before the majority opinion became effective, it was withdrawn and the appeal was placed on the rehearing docket. Upon re-argument, it fell to the present panel.

The facts are stipulated and show: On April 1, 1951, appellant issued to appellee its "Multiple Coverage Policy" counter-signed in Atlanta, Georgia, wherein it provided to stated limits [1] coverage for, inter alia, bodily injury and property damage liability.[2] During the policy period one of appellee's trucks, being operated in a negligent manner by his employee and in furtherance of his business, collided with a freight train of Charleston & Western Railway Company in Richmond County, Georgia, derailing the train and causing damage to sixteen cars, to the contents of those cars and to the roadbed of the railway company. The railway company subsequently instituted a civil action in United States District Court against appellee, seeking to recover the sum of $75,000 as damages sustained by the railway company and by the owners of the damaged cars and contents. Appellant undertook to defend the railway company's action and, by written agreement between appellant and

---

[1.] "No insurance is provided under any of the following Sections unless so indicated by entries showing the Company's limit of liability.

"The limit of the Company's liability under each such Section shall be as stated therein, subject to all of the terms of this Policy and Insuring Agreement having reference thereto.

| "Sections | "Limits of Liability |
|---|---|
| "A. Bodily Injury Liability (Including Automobile) | "$100,000.00 each person<br>"$300,000.00 each occurrence<br>"$ Not Cov. aggregate products and completed operations |
| "B. Automobile Property Damage Liability | "$ 5,000.00 each accident |
| "C. Property Damage Liability Other than Automobile | "$ 25,000.00 each accident<br>"$ 50,000.00 aggregate operations<br>"$ 50,000.00 aggregate protective<br>"$ 50,000.00 aggregate contractual<br>"$ Not Cov. aggregate products and completed operations" |

2. "I. Section A—Bodily Injury Liability (Including Automobile)

"The Company agrees to pay on behalf of the Insured all sums which the Insured shall become obligated to pay by reason of the liability imposed upon him by law or contract for damages, including damages for care and loss of services, because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person or persons.

"II. Section B—Automobile Property Damage Liability

"The Company agrees to pay on behalf of the Insured all sums which the Insured shall become obligated to pay by reason of the liability imposed upon him by law or contract for damages because of damage to or destruction of property, including the loss of use thereof, caused by accident and arising out of the ownership, maintenance or use of any automobile.

"III. Section C—Property Damage Liability Other Than Automobile

"The Company agrees to pay on behalf of the Insured all sums which the Insured shall become obligated to pay by reason of the liability imposed upon him by law or contract for damages because of damage to or destruction of property, including the loss of use thereof, caused by accident."

appellee, that action was compromised and settled for the sum of $30,000; and a consent judgment to that effect was entered.

In the written agreement, it was provided that appellee should contribute $25,000 to the payment of the judgment and appellant should contribute $5,000. It was further agreed that such contributions or payments should be made without prejudice to any of appellee's rights under the policy to insist that appellant was obligated to pay up to the sum of $5,000 for the damages done to the property of each of the owners of any of the railway cars involved in the collision, the contents thereof and the roadbed of the railway company, and without prejudice to any of appellant's rights to insist that its maximum liability under the policy was the sum of $5,000 for the entire damage done to all the property damaged in the collision, irrespective of whether or not property of more than one party was damaged.

It was further stipulated that as finally contended by the railway company, the sixteen damaged railway cars belonged to fourteen separate owners and sustained damages in amounts ranging from $349.63 to $4,015.67, total damage to the railway cars being $41,371.31. The contents of the railway cars, belonging to numerous shippers, were damaged in the total amount of $7,638.91; and damages to the roadbed were determined to be $9,000.

Following the payment of the judgment in the railway company's suit, appellee instituted this action against appellant for the recovery of the $25,000 paid by him to the railway company, alleging appellant was legally obligated to pay the full amount of the judgment "because under a proper interpretation of said policy, as shown by the decision of the United States Court of Appeals, Fifth Circuit, in the case of Anchor Casualty Co. v. McCaleb, 178 F.2d 322, there was a separate accident as to each owner of property damaged in said collision and defendant was legally liable to pay up to the sum of $5,000.00 on account of the property of each owner whose property was damaged in said collision."

The facts being stipulated, the trial court decided the case upon appellee's motion for summary judgment and, without opinion, entered judgment for appellee as prayed for. The appeal from that judgment raises the sole issue of the proper interpretation of the phrase "$5,000.00 each accident" as the stated limit of liability for automobile property damage (see footnote 1).

■ We first turn to the law of Georgia for guidance in approaching the solution to this problem. We find no cases expressly deciding the issue, but in that state, as in most jurisdictions, insurance contracts must, in the final analysis, be construed so as to carry out the true intentions of the parties. Georgia Code, § 56–815; Hulsey v. Interstate Life & Accident Ins. Co., 207 Ga. 167, 60 S.E.2d 353. It is true that Georgia also follows the general rule which decrees that all ambiguities in an insurance contract shall be construed most favorably to the assured. However, the words used must be given their usual and ordinary meaning, and we may not strain their construction in order to perceive ambiguities. Hulsey v. Interstate Life & Accident Ins. Co., supra; Nichols v. Ocean Accident & Guarantee Corp., 70 Ga.App. 169, 27 S.E.2d 764; Hartford Fire Ins. Co. v. Wimbish, 12 Ga.App. 712, 78 S.E. 265; Aetna Life Ins. Co. v. Padgett, 49 Ga.App. 666, 176 S.E. 702.

The only limit expressed in the policy for automobile property damage liability is the disputed phrase "$5,000.00 each accident." It can hardly be denied that when ordinary people speak of an "accident" in the usual sense, they are referring to a single, sudden, unintentional occurrence. They normally use the word "accident" to describe the *event*, no matter how many persons or things are involved.

Were the matter being presented to us without reference to the cases cited, we should be obliged to conclude it was the intention of the parties to this policy

that the word "accident" be given that meaning.[3] In Section A, bodily injury coverage is provided to limits expressed both in relation to the victim or injured party ("$100,000.00 each person") *and* the event ("$300,000.00 each occurrence"). Thus, it would appear, one "occurrence" resulting in bodily injury to three persons could expose the insurer to liability up to $300,000.00. Further, in explaining this coverage, the policy speaks of injuries "sustained by any person or persons." (See footnote 2.) However, no such intention to consider liability in relation to the individual claimants is expressed in Section B, providing automobile property damage coverage. We must consider such a distinction in approach to have been deliberate, and it seems evident that the purpose could only have been to express the limits of property damage liability without regard to the number of owners or items of property involved. This is made abundantly clear in the later policy definition of automobile property damage liability, when it is said that the company agrees to indemnify liability for "damage to or destruction of property * * * *caused* by accident * * *." (Emphasis supplied.)

■ If further support for this construction is needed it may be found when it is observed that the disputed phrase appears in the column headed "Limits of Liability" which follows the sentence having as its subject, "The limit of the Company's liability." Manifestly, it was intended that the policy have monetary limits of coverage; but consideration of the amount stated in relation to the claimants damaged rather than the event causing the damage would make the policy potentially limitless. Moreover, it is well known that the premium rates for liability insurance are based upon the risk insured and the potential amounts of liability covered. Such a system of computing rates is simply incompatible with the idea of virtually limitless liability depending solely upon the number of claimants.

Considering only the policy involved here without reference to previous judicial interpretations, we think it clear that the word "accident" as used in the disputed phrase was intended to be construed from the point of view of the cause rather than the effect. Hence, unless the doctrine of stare decisis requires another interpretation, the limit of appellant's liability would be $5,000.00, since all property damage occurred in the single, sudden and unintentional collision.

■ Of course, the existing law, including judicial precedents, must be read into all contracts; and we must now consider the present policy in the light of prior cases. The two cases relied upon by appellee to alter the construction plainly indicated by the bare words of the policy are South Staffordshire Tramways Co., Ltd. v. The Sickness and Accident Assurance Assn., Ltd., 1 Q.B. 402 (1891), and Anchor Casualty Co. v. McCaleb, 5 Cir., 178 F.2d 322.

We need not discuss the English case at length. Not only do its origin and vintage detract from its value as a legal precedent, but we think it more favorable to appellant than to appellee. The court there considered the policy as a whole and reached the conclusion that when the limits were expressed in terms of "accidents caused by vehicles", the word "accident" *in that policy* meant, as one judge put it, "the mischief suffered by a person injured to his person or property." Precisely the same approach leads to exactly the opposite result here, as previously shown.[4]

---

3. In Willingham v. Life & Casualty Ins. Co., 216 F.2d 226, 227, this court referred with approval to "the principle that ordinarily the same words used in different clauses of a contract will be understood to have been used in the same sense." See also 29 Am.Jur., Verbo "Insurance", Sec. 159; 44 C.J.S., Insurance, § 294, p. 1155.

4. For interesting discussions of the South Staffordshire case, see the opinions in Hyer v. Inter-Insurance Exchange, 77 Cal.App. 343, 246 P. 1055.

After thorough study of the record and the opinion of this court in Anchor Casualty Co. v. McCaleb, supra, we are convinced that case is also distinguishable and therefore does not prevent our construction of the policy in suit. In Anchor, there was a multiple coverage policy indemnifying the insured against liability arising from, among other hazards, the operation, maintenance or use of described premises where the insured was drilling an oil well. Property damage liability coverage was stated to be $5,000.00 "each accident" and $25,000.00 "aggregate". The well blew in and was wild for a period of fifty hours, and damage to the properties of several persons resulted. The insurer sought to limit its liability for all property damage to the sum of $5,000.00, contending that all damages resulted from one "accident", namely, the blowout. However, in commenting upon the facts, Judge Holmes' opinion discloses the following circumstances which we think clearly distinguishable from those presented here:

> " * * * The blowing-out of the well was not a single accident but a series of events, a catastrophe. Numerous accidents were the product of this motivating force *and the wind as a supervening force.* The eruptions continued *intermittently* for over two days; and during this period *the wind changed* from time to time, blowing mud and sand on different properties. * * *." (Emphasis supplied.) 178 F.2d 324.

Confronted with such a factual situation, this court then held that the damages had resulted from a "series of events" rather than an "accident" and that the limit of the insurer's liability was expressed by the phrase "$25,000 aggregate." We think the opinion leaves little room for doubt that this was its true basis, and the "series of events" or continuing and spreading "catastrophe" there involved is not at all comparable to the single, sudden collision with which we are concerned here.

Moreover, although we think the facts as there stated by the court [5] sufficient to distinguish Anchor, we also point out the substantial difference in the wording used in that policy to express the limits of property damage liability. By providing "aggregate" coverage far in excess of that for "each accident", the policy gave rise to a necessity for construction not present here. There was at least some basis for reasoning that the parties to that policy might have had in mind something other than the ordinary meaning of the word "accident". Here, there is nothing in the policy indicating such an intention.

We are convinced that the language in Anchor to the effect that a separate accident occurs with respect to each owner of damaged property was not necessary in the opinion. We believe that the conclusion was based upon the court's appreciation of the facts and its construction of the policy provisions as applied to those facts, and accordingly we do not consider the opinion dispositive of the issue presented here. The single, sudden and unintentional collision involved here was one accident, and the insurer's liability for all property damage resulting therein is $5,000.00.

For these reasons, the judgment appealed from is reversed and the cause is remanded with instructions to enter judgment for the defendant-appellant.

Reversed.

---

5. There is some dispute as to whether the record in the Anchor case contains anything to substantiate the statement in the opinion that there were *intermittent* eruptions of the well. We consider this immaterial for two reasons. First, we think the unquestioned facts of *continued* eruption and *changing* winds sufficient to constitute what occurred in Anchor a "series of events" and to distinguish that case from the instant suit. Second, the conclusion there reached was necessarily the result of consideration of the facts *as there understood and stated by the court.* It is upon the written opinion that we base our consideration of the decision as a legal precedent. See 14 Am. Jur. 289.

CAMERON, Circuit Judge.
I dissent.

CAMERON, Circuit Judge (dissenting).

The able opinion of the majority, in my judgment, overrules a case heretofore decided by this court, repudiates a rule of decision adhered to by a majority of the courts and reaches the wrong result with respect to the parties to this case. I am, therefore, unable to go along with the decision and think the whole matter important enough to warrant demonstrating the correctness of the foregoing statements by a detailed examination of the authorities.

### I.

I am in accord with the thought of the majority that, basically, it is our job to ascertain by accepted procedures the meaning of the contract between the parties. Where they have written their contract down and agreed upon it, it is our duty to take the words they wrote, to put ourselves as nearly as possible in the position of the parties when the memorial of their contract was executed, and to determine its meaning from the words they used. If those words are susceptible of only one construction, that is the full measure of our duty, subject to the duty to read the existing law into the contract as set forth *infra*. At the outset we must realize that the use of the word "they" in the foregoing sentences must be with reservation because the writing these parties agreed upon as the memorial of their contract was not their joint product. Everybody knows that an insurance policy is the product of the company alone and the other contracting party must accept it as a completed package. This court, many years ago, placed its estimate on this feature and on the disparity attending the positions of the parties:[1]

"The language of an insurance policy is the language of the company. It is prolix, involved, conflicting. Important provisions, printed in small type, are rarely read by policy holders. If read, the policy holder would know little more about the contract entered into. If the companies desire clearness, there would appear to be no good reason why it should not be attained; and, in its absence, the courts will give that construction which will, as nearly as may be, give effect to all parts of the instrument and bring results as nearly approximating equity as possible.

"The insurance companies have shown no lack of capacity in so framing language as to protect themselves, and, if they had intended the result herein contended for, the first of the clauses would doubtless have read something as follows * * *."

I agree also with the opinion of the majority concerning the effect of legal principles on this contract and adopt the language of the majority opinion:

"Of course, the existing law, including judicial precedents, must be read into all contracts * * *."[2]

Inevitably our own case of Anchor Casualty Co. v. McCaleb,[3] looms largest before us, but it will be helpful to lay that case aside and take a look first at the legal picture as it existed before Anchor and independently of it. Since it is agreed that appellant wrote the policy, and since we have held that the average business man has no capacity for divining the meaning of an insurance policy, and since the majority sets out that existing law must be read into this insurance contract, it would be our duty to place ourselves in the position of appellee, to whom it had been delivered for inspection, and assume that he, an average

1. Royal Exchange Assur. of London v. Thrower, 5 Cir., 1917, 246 F. 768, 771.

2. It is interesting to note that, having made this concession, the majority did not seek to justify its construction of the contract by the citation of any legal precedent. In Note 4, it cites the Hyer case but only to point out its discussion of Staffordshire.

3. 5 Cir., 1949, 178 F.2d 322.

man, had consulted the average lawyer to ascertain the meaning of the phraseology which engages the attention of the court: "Limits of liability * * * automobile property damage liability, $5,000.00 each accident". The crucial words are, as demonstrated by the majority, "each accident" and our average man, aided by the average lawyer, is called upon to decide the legal meaning of those words as used in this policy.[4]

It should be borne in mind always that the subject matter of the policy before us is *liability,*—the liability of the appellee, insured. Moreover, the liability insured against is his *liability* to *third persons*. The minds of the parties entering into the contract were logically focussed therefore on the liability of appellant to those injured by appellee or his agent. That is the central theme and the only thing which logically would form the subject of thinking and negotiation between insurer and insured. *Cause* was not a part of their dealings for the insurance company was assuming the liability of appellee to pay *damages to third persons regardless of cause.*

## II.

(a) The appellee, called upon to determine what the law has read into the policy, will find, running through all of the authorities, the basic test to be decision as to whether the accident is to be judged from the standpoint of *the cause* of the accident or the *effect or results* of the accident. To the resolution of that basic conflict, appellant brings forward in its brief as its chief reliance, the Hyer case.[5] As far as decided cases go besides An-

chor, appellee places his main reliance on an English case, which we will refer to as the Staffordshire case.[6]

The Hyer case presents to appellee a well-written majority opinion and a well-written dissent. That case involved the question whether the limitation of $1,000 provided in that policy, "with respect to *claims* (including *claims* for loss of use) *arising from one accident*"[7] furnished protection to the *insured for damages* aggregating $1,500 to two separate automobiles. Insured's Marmon car had collided with an Overland doing a damage of $1,000 and the Marmon's steering apparatus had been put out of commission, causing it to change its course and to damage a Cadillac in the sum of $500.00. Suit for $1,500 was brought by Hyer against his insurance carrier.

The majority in that case felt that the limit of $1,000 should be held to cover damages to all items of property, basing its holding solely on the conclusion reached by it that the word "accident" was to be interpreted from the standpoint of the *cause* of the accident rather than its *effect*. Its decision was based mainly on an English case[8] and the majority opinion thus epitomizes the fundamental reasoning of the line of cases which adopt that approach:

> "It also will be noticed that under this quite generally approved definition the word, as used in some classes of cases, denotes the *cause* of the hurt or loss; in other classes of cases it denotes the *event*, i. e., the unintended and unexpected *loss* or hurt *apart from its cause*; * * *

4. In general, in the following observations, when "appellee" is used, we refer to him as the average man acting on the advice of the average lawyer in deciding whether he will accept the policy tendered him by the insurance company. This treatment will best enable us to place ourselves in the position of the parties when the Insurance Company prepared the policy and presented it for acceptance to the insured. In other words, we must determine what the law then was and read it into the contract and decide what the parties meant by the words they used

plus the law we have read into the contract.

5. Hyer v. Inter-Insurance Exchange, etc., 1926, 77 Cal.App. 343, 246 P. 1055.

6. South Staffordshire Tramways Co., Ltd. v. The Sickness and Accident Assurance Association, Ltd., 1 Q.B. 402 (1891).

7. In every instance where emphasis is used it is supplied by us unless otherwise indicated.

8. Tinline v. White Cross, etc., Ass'n, 1921, 3 K.B. 327.

"But, as commonly used in liability insurance policies, the word 'accident' is predicated on an *occurrence* which is the *cause of the injury*. That is to say, as used in liability insurance contracts the word is employed to denote the *cause*, rather than the *effect*. \* \* \*

"Where, as here, one negligent act or omission is the *sole proximate cause*, or causa causans, there is, as a general rule, but *one accident, even though there be several resultant injuries or losses*. \* \* \*

"If it be proper to say that there is one 'occurrence' where two persons are injured in an automobile collision, then it is a mistake to say of such a case that there are two 'accidents'; for in a general sense every automobile *accident* is an *occurrence* \* \* \*

"So here, the collision with the Cadillac, a part of the general catastrophe in which the three automobiles were involved, was but an 'incident' of the accident, and *not a separate accident*." [9]

We might digress from the central thought long enough to quote from the majority opinion [10] a sentence which shows a rather valid point of difference between the Hyer case and the one now being considered:

"The use of the word 'claims', in the plural, in connection with the words 'one accident', clearly indicates that the parties understood that *there might be several claims* arising from one accident—as, for instance, where, as here, the vehicles of two or more persons are injured —but that though there might be several injuries and therefore several claims, the total liability of the insurer should not exceed $1,000 if the claims all arose from one accident."

This parenthetical observation tends to discount the Hyer case as persuasive authority in the one before us now because our policy contains no such words.

But it is plain that the genius of the Hyer case is that, with respect to liability policies, the words of limitation, one accident, should be interpreted in the light of the *cause* of the accident, rather than the *effect* of the accident.

It is desirable to read the carefully worded dissent in the Hyer case, both to make that clear and to find a good expression of the opposite point of view. In other words, the dissent [11] declares the law to be that, in liability policies, these same words of limitation must be construed from the standpoint of the *effect* and not from the standpoint of the cause of the accident:

"But my associates hold that an unusual meaning was intended by the parties, and that the word 'accident' had reference to the *cause of the events* rather than to the events themselves. Of course, if this indemnity policy contemplated that an 'accident' referred to a cause, and not to an 'event', but one accident occurred, for there was but one cause \* \* \*

"There is a clear distinction between an insurance against accidents which may happen to the insured, and one indemnifying him against loss for injuries which he may wrongfully cause to others. \* \* \* There, the [indemnity] contract contemplates reimbursement of the assured by the insurer *of loss sustained* as a consequence of the latter being required to *pay a third party* for injuries inflicted upon said third party or his property. \* \* \* In such a contract the insurer is not concerned with the cause, \* \* \*; and so, when a limit is placed upon his liability for any one accident, the *cause is not taken into consideration*,

9. These disconnected paragraphs are brought together from pages 1057 and 1058 of 246 P.

10. 246 P. 1059.

11. 246 P. 1059–1064.

but only the *event and the loss resulting therefrom to the assured.* * * *

"The policy did not stipulate a maximum of liability to the extent of $1,000, for all damage *resulting from one proximate cause;* it limited the liability 'with respect to claims * * * *from one accident'.*"

Here, therefore, we have a clear and accurate expression in this case of the two viewpoints which represent the fundamental difference between the majority here and the rule announced in the Anchor case. The majority there (in Hyer), as here, construes this limitation to provide for a maximum of liability "resulting from one proximate cause"; on the other hand, the dissenting judge there construes that limitation as applying to the result upon the injured person, protection against whose claim is the subject of the insurance.

The Hyer dissent thereupon quotes at length from the Staffordshire case, and I do not think I could do better than to quote at this point what the dissenter quoted from the Staffordshire case: [12]

"'It is, I think, to be borne in mind that the object of the policy is to provide for the assured an indemnity against claims made upon them for injuries resulting from the negligence of their servants. This being so, I think it more appropriate to hold that the preceding word, "accidents", is used from the point of view of the *several claimants upon the assured for injuries,* each of whom claims in respect of a specific accident to himself, and not from that of the insurers, and that therefore "any one accident" means *any accident to any one claimant upon the insured.'* "

Upon appeal this position was adopted by the Court of Queens Bench, which added these words:

"These were claims for personal injury, i. e. injury to the person, and each person injured claimed for injuries in respect of an accident to his person caused by a vehicle. If several persons were injured, I think, upon the true construction of this policy, there were several accidents. * * * *"

The foregoing quotations illustrate accurately the definite line of cleavage between two schools of thought. Which of these will appellee accept as defining his rights in the contemplated contract? Will he decide that the words of limitation, each accident, shall be construed from the standpoint of the cause of the accident or from the standpoint of the effect of the accident on different claimants and therefore on him, the proposed insured? The Hyer case and the Staffordshire case present the opposing views; which will appellee be justified in following?

(b) The following general statement of the law is taken from Couch "Cyclopedia of Insurance Law", Vol. 5, Chapter XVI, Par. 1165 B, p. 4136:

"Again, if one cause operates upon several at one time, it cannot be regarded as a single accident, rather the *injury to each individual is a separate accident,* within the meaning of an insurance contract in a specified sum against *liability* to pay claims for personal injuries or damages caused by accidents, and the *amount specified applied to each separate accident,* and not to all of them as one accident."

That quotation is taken from a chapter headed, "Property and Liability Insurance", and the paragraph bears the heading "Accident Indemnity Insurance Risks, Generally". The text would seem to cover this situation exactly, and an examination of it shows no contrary rule and no exceptions to the general rule as stated. Appellant claims in its brief that this text ought to be ignored because it is based upon the Staffordshire case. There are others who would ignore the Staffordshire case or discount it

---

12. 246 P. at page 1063.

greatly. For instance, the concurring judge in the Hyer case [13] pays his respects to that case.[14] The nub of that complaint is that it concedes the general acceptance of Staffordshire by "annotators, text-writers, and judges". The majority opinion here seems to look with some disfavor upon Staffordshire because of "its origin and vintage".[15]

That source and vintage are the same as they were in 1924, when the editors of Corpus Juris accepted it as part of the source of its text [Note 16 *infra*]; as in 1929, when Couch found it a sound base for his text; as in .1949, when it was urged upon us as a main reliance of appellees in Anchor; as in December, 1954, when the other panel of this court which affirmed this judgment looked upon it with approval and cited and quoted from it as sound authority. It might be noted also that, although the majority disavows any attack upon Anchor, it readily rejects an important part of its undergirding.

Under the general heading of "Amount or Extent of Insurer's Liability", Corpus Juris defines the words "any one accident" thus: [16]

" *'Any one accident'*. A limitation of liability to a certain sum 'in respect of any one accident' permits recovery up to that amount for *each in-*

*jury suffered by each of a number of persons injured at the same time,* although the aggregate claims far exceed the sum fixed, except that the aggregate recovery, in any one accident, cannot exceed a designated amount, where the policy fixes such a limit."

If the "vintage" of that text is thought to belong to antiquity, it might be noted that Corpus Juris Secundum contains a statement of like import.[17]

Appellee would, therefore, be inclined to accept the tendered insurance contract based on the fact that the texts seem to accept without reservation that these words of limitation, "each accident", should be construed from the point of view of the person whose property was injured, rather than from the point of view of the proximate cause of the accident. And he would find some Georgia cases containing general language hospitable to that thought. Those cases [18] are disposed of by the brief of Association of Casualty & Surety Companies, *amici curiae* here, on the ground that, "All three cases involve situations wherein an insured suffered death through the wilful and unprovoked act of a third person; in each case the court correctly held that so far as the insured was concerned the death was accidental". That seems to

---

13. 246 P. at page 1059.

14. "I desire, especially, to announce my concurrence in the reasoning whereby the writer of the opinion distinguishes the case of Staffordshire * * * from the present one. If, however, that case is not distinguishable from this, I am of the opinon that it was wrongly decided. * * * I think the English case has been given a fictitious importance by the very general application of its doctrine *which has been made by annotators, text-writers and judges.*"

15. Except for these words of derogation, coming from so distinguished a source, I would think that Americans would be constrained to look with spontaneous reverence upon the decisions of the highest court of that Realm, mother at once of our tongue, our race, our institutions, our laws.

16. 36 Corpus Juris, Liability Insurance, Sec. 65, p. 1090.

17. 45 C.J.S., Insurance, (Subdivision, Liability Insurance), § 925, p. 1038, note 96.
    Perhaps it is pertinent at this juncture to conclude that appellee would be fairly justified in accepting the general rule announced by texts of such recognized authority, particularly when no dissent is mentioned. Text writers of distinction carry weight because the Bench and Bar generally accord to them a degree of learning and quality of discrimination which enables them to look to such decisions as Staffordshire and Hyer, and to accept one rather than the other as stating generally accepted legal principles.

18. New York Life Ins. Co. v. Jennings, 1939, 61 Ga.App. 557, 6 S.E.2d 431; Travelers' Ins. Co. v. Wyness, 1899, 107 Ga. 584, 34 S.E. 113, and Travelers' Ins. Co. of Hartford v. Newsome, 1918, 147 Ga. 608, 95 S.E. 4.

be a criticism of some validity and robs these Georgia cases of some of their persuasive force.

But there are a number of cases holding the same general principle which did not arise out of these so-called accident policies, and the statement now quoted which immediately follows the foregoing quotation from the same brief does not show why they should not be considered persuasive authority here:

> "It should be stressed that these cases were concerned with payment to the insured upon his 'accidental' death. *They did not involve third party liability insurance* (wherein the injured claimant is not a party to the contract) and hence are readily distinguished."

As stated, there are a number of cases which do arise under "third party liability insurance" wherein it is held that the word accident "must be interpreted from the standpoint of the person whose property [or person] is damaged".

One of the leading cases [19] involved the question of whether an assault committed by a foreman upon an employee was an accident. The contention of the insurance company there is thus epitomized in the decision: "Appellant contends that the assault on Pendergraft, having been willfully and intentionally inflicted by appellee's foreman, was not covered by the policies, because they provided indemnity *only for 'injuries accidentally suffered'*. The question, therefore, is whether a person who has been assaulted and in-

jured by another, without any provocation on his part, has suffered an accidental injury."

Having thus stated the question and adverted to the fact that there is a diversity of opinion on the question among the courts, the Supreme Court of Mississippi held that this deliberate assault was an accident, and gave as the basis for its decision this reason:

> "Whether an injury is accidental, is to be determined *from the standpoint of the person injured.* * * *."[20]

In the absence of a contrary case from a state belonging to this circuit, it would seem that this holding by a court of the standing of the Mississippi Supreme Court, and adopted by American Jurisprudence, would be found quite persuasive to this court.

Moreover, appellee would find that this case is expressive of the majority view of courts generally, this being the language of an extended note treating that case among others.[21]

This complete note seems to assemble all of the cases and to distill the foregoing rule from them. It is clear that an assault probably puts the greatest strain on a court called upon to classify it as an accident, particularly where deliberately committed by the alter ego of the insured as in Georgia Casualty Co. v. Alden Mills, supra. To classify an assault as an accident solely on the ground that the language must be viewed from the standpoint of the one assaulted is to extend

---

19. Georgia Casualty Co. v. Alden Mills, 1930, 156 Miss. 853, 127 So. 555, 556, 73 A.L.R. 408; this case is cited as the authority for the text of Am.Jur., Insurance, Par. 1070, p. 804.

20. This case was followed by this court in a civil action arising in Mississippi, Western Casualty & Surety Co. v. Aponaug Mfg. Co., 5 Cir., 1952, 197 F.2d 673, 674. We there sanctioned without reservation the doctrine that the meaning of the term "'caused by accident'" should be construed from the standpoint of the *recipient* of the act causing damage rather than the one *causing* the damage.

21. "Liability Insurance: Assault as an Accident, or Injuries From It as Accidental, Within Coverage Clause, 33 A.L.R.2d 1027, 1030: 'It is apparently the more widely accepted view that an assault constitutes an accident and that injuries therefrom are accidentally sustained within the coverage of liability insurance policies. However, there is substantial authority to the contrary. * * The determination whether an assault constitutes an accident appears to *depend on the person from whose standpoint the court views the occurrence* * * *.'"

this doctrine much further than this court was called upon to apply it in the Anchor case.

This note analyzes cases from nineteen states, including cases in two United States Courts of Appeal classified as state decisions, and classifies eleven states as holding the majority view requiring construction from the standpoint of *the injured person*, five as holding the minority view that construction should be from the standpoint of the *cause*, and three as having cases holding both ways. Rejecting the cause and adopting the result in arriving at the majority rule was especially difficult because practically all of the liability policies under consideration in the cases treated in the note contained some such phrase as "caused by accident".

Appellee, debating acceptance of the proffered policy, would, therefore, be justified in accepting that the majority rule favored the thesis that, in general, the words "each accident" should be construed from the standpoint of the person receiving the injury.

### III

Then he would come to the Anchor case which appellee contends, and the court below manifestly thought, is directly in point and determinative of the case before us. If appellee [and his lawyer] was careful, he probably examined the record which was before us in the Anchor case under our teaching expressing the universal rule: [22]

> "Expressions of a court must be interpreted and applied in the light of issues and facts then before the court for review and decision."

Anchor was a declaratory judgment action tried by Judge Kennerly, filed by the insurance company against McCaleb, Potter, Hansbro, Barraque, Key, Willmering and Freedman. Barraque, Key and Willmering were joined because they had sued McCaleb, Potter and Hansbro for damages sustained by them when an oil well being reworked by McCaleb, Pot-

ter and Hansbro "blew out, causing oil, gas and sand to be blown into the air and to fall on the surrounding area".

McCaleb and his partners contended that Anchor was liable to indemnify them against all claims propounded by the persons suffering injury and regardless of the fact that the policy sued upon by Anchor contained this limitation: "Limits of Liability * * * Property Damage * * * $5,000.00 each accident". The evidence showed without contradiction that the well blew out and remained a "wild well" for approximately fifty hours. The operations covered by the liability policy were "oil or gas wells —drilling or redrilling, cementing or installation of casing * * *". The liability of McCaleb et al. to Barraque et al. grew out of these operations. The oil, sand and mud was projected from the wild well onto their respective houses. One set of houses was damaged when the wind was blowing from one direction, another set when the wind was blowing from another direction, etc. But the operation was one operation, the blowing out was one event, and the results came from one continuous and unremitting flow of sand, oil, etc., from the well to the damaged properties. Here is the pertinent finding of facts made by Judge Kennerly:

> "This well blew out, and over a period of a number of hours sprayed the property on which it was situated, and some of the sourrounding property, with oil, mud, etc. The defendants Barraque, Key, Willmering, and Freedman are claiming that their property was so sprayed and thereby injured and damaged, and are asserting claims against McCaleb, Potter, Sr., and Hansbro, and against plaintiff [Anchor] for damages. The main question is whether plaintiff is liable under such policy to such defendants, and if so, the amount of such liability. * * *
>
> "(d) The oil or gas well blew out and sprayed the property of McCal-

22. First syllabus of Ham v. Blankenship, 5 Cir., 1952, 194 F.2d 430.

eb, Potter, Sr., and Hansbro with oil, mud, etc. As the wind shifted over a period of several hours, it in like manner sprayed some of the surrounding property, including it is claimed that of the other defendants."[23]

This court affirmed that judgment based upon those findings. Judge Kennerly had been called upon to decide the case by declaring the meaning in law of the term "each accident", and we were called upon to make the same decision. Here is the heart of our decision:[24]

"The wording 'each accident,' as used in the policy, must be construed from the *point of view of the person whose property was injured.* In Bouvier's Law Dictionary, an accident is defined as an event which, in the circumstances, 'is unusual and unexpected *by the person to whom it happens.'* When the separate property of each claimant was damaged, an accident occurred to the property of each owner. If one cause operates upon several at one time, it cannot be regarded as a single incident, but the injury to each individual is a separate accident."

It is plain that this court took cognizance of the two schools of thought, one holding that such a limitation using the words, "each accident", should be construed from the standpoint of the *cause* of the accident, and the other school of thought holding that the term should be construed from the standpoint of *the person whose property was injured;* and this court aligned itself with the latter school of thought which indisputably represented the weight of authority. It is difficult to perceive that there is any reasonable doubt concerning the meaning of the words used by this court based upon the facts as found by Judge Kennerly and the wording of the insurance contract before it. It is further plain that the declaration of this principle of law was all that was necessary to decide the Anchor case. That rule of construction went to the heart of the whole problem and it was not necessary to say anything else. Everything else said by the court in that decision was *arguendo* and to buttress and fortify the one vital and important point decided.

### IV

Since the majority discusses other language of the opinion at some length, it is proper to advert to it briefly here. An examination of the evidence, the findings of the trial court, and the briefs of counsel all show that the entire fight before this court then was waged around the legal meaning of the phrase "each accident". There was no contention on the part of any party, and no mention in the record or briefs of the idea that more than one event or occurrence was involved. From the quotations above set out

23. In the conclusions of law the following declarations were made among others:

"2. That plaintiff is liable under such policy for a maximum of $5,000.00 for *each* accident, with an aggregate, or limit of, liability of $25,000.00 if there be more than one accident. [Emphasis not added]

"3. If such well sprayed the property of Frank I. Barraque with oil, mud, etc., same was a separate and distinct accident within the meaning of such policy, and such accident is within the coverage of such policy."

Then followed identical declarations 4, 5, 6 and 7 with respect to the other claimants.

The final judgment contains these words:

"That the measure of plaintiff Anchor Casualty Company's liability to pay on behalf of the insured all sums which insured may become obligated to pay, if any, to defendant Barraque is limited to not over $5,000.00, to defendant Key not over $5,000.00, to defendant Willmering not over $5,000.00, to defendant Freedman not over $5,000.00, and liability to any others bringing actions similar to the aforesaid is limited to not over $5,000.00 each; that injury to each of the above named defendants and others constitutes one accident within the terms of the policy, * * *."

24. 178 F.2d 322 at pages 324–325.

from the Findings and Conclusions it appears that, while the trial court did mention the matter of the shifting of the wind, no significance was attached to that fact and it was not mentioned as a ground of decision. The majority seems to find in the shifting of the wind the main ground for differentiating the Anchor case from the one before the court, every reference to the changing of the wind being underscored by it.

It is difficult indeed to grasp just what the majority is attempting to prove with respect to the wind. Everybody agrees that the operation covered by that policy was a drilling operation and that McCaleb et al. were protected by Anchor from claims made against them by people injured as the result of that operation. Everybody agrees also that the well blew out and went wild. If McCaleb et al. were liable to any persons for resulting damage, Anchor was compelled to protect them against their claims.

Now where does the wind come in? Does the majority intend to accept the thesis that, if the wind continued to blow from one direction only, sometimes harder than at others, Anchor would have been liable only for the $5,000.00 limit; and does the reasoning go a step further and accept the premise that, if the wind changed five times and damaged five people at separate times, each to the extent of $5,000.00, Anchor would be liable for $25,000.00? Does the fortuitous shifting of the wind alter the contractual obligation assumed by Anchor and arising from the single event of the blowing out of the well?

If that be the concept of the majority it could make sense only upon the theory that the contract was changed under the doctrine of Intervening Efficient Cause.[25] But that principle of law could not be invoked to explain Anchor because conditions and forces of nature are excluded from the Intervening Cause doctrine:

"The ordinary conditions or forces of nature, such as ordinary wind, cold, heat and the like * * * are not, in general, independent, efficient causes where they affect or operate on a negligent act or omission in causing a result. * * * The fact that the wind changes direction during the course of a fire negligently started by a person does not relieve him of responsibility for the destruction of the property to which the flames are carried after such change in the wind." [26]

And this court held a tug liable for delay in a towing undertaking by reason of increased hazard resulting from prolonging the time of exposure when the injury resulted, not from normal wind as in Anchor, but from a sudden squall or norther, The Mariner (Jacobson v. Suderman), 5 Cir., 1927, 17 F.2d 253, 254.

The fact is perfectly clear that the whole genius of the Anchor holding is that this limitation containing the words, "each accident", must be construed from the standpoint of the person injured to mean each accident to each individual person injured. The Anchor case is therefore added to the array of authorities which had come before appellee pondering whether he would accept the insurance policy tendered him.

**V**

The foregoing discussion fails to take into consideration the rule requiring liberal construction of policies in favor of the insured. The fact that Georgia has passed a statute giving expression to the common law rule rather stresses the presence of a determination that the rule shall be strictly observed.[27]

Moreover, the briefs now before us abound in language from Georgia deci-

25. Cf. 38 Am.Jur., Negligence, Sec. 68 et seq. pp. 724 et seq.

26. 38 Am.Jur., Negligence, Sec. 75, p. 734.

27. Georgia Code Anno. (1936) § 20–704, subd. 5.

sions showing how strong is the adherence to this rule: "The terms used and any ambiguities in an insurance contract will be construed against the insurer who prepared and proposed the contract."[28] "If the clause is ambiguous, or of doubtful or dual interpretation, that construction must be given which will be most favorable to the insured * * *."[29] "If a policy of insurance is capable of being construed in two ways, that interpretation must be placed upon it which is most favorable to the insured."[30] Strong words, those! "Capable of" is defined as "susceptible of; admitting of; open to". "Ambiguous" is defined as "having two or more possible meanings".

In view of the array of authorities we have discussed, it is difficult to perceive how the majority can hold the view that the terminology of the policy now before us is not susceptible of more than one construction or more than one possible meaning. We might use again a quotation from the Hyer case, the one upon which appellant places main reliance:[31] "The word accident probably has been discussed in adjudications as often as any other word in the English language. *It is not a technical term, with a clearly defined meaning*, and it has been used in more than one sense. * * *"

In the one note above referred to[32] cases are collected from eleven states, including two United States Court of Appeals decisions, which have held that an assault is an accident within the terms of a policy insuring against accidental injury because the crucial words are defined from the standpoint of the person assaulted; while the opposite result has been reached in decisions from five states.[33]

## VI

It is clear, therefore, that the Anchor case followed the rule of construction announced in the textbooks and in the majority of decided cases. In my opinion the decision there reached was correct.

Based upon Anchor and the authorities I have discussed and others, Judges Holmes and Borah concurred in an opinion in the present case affirming the decision of the lower court permitting recovery here of a total of $25,000.00 under the stipulation between the parties.[34] The heart of the opinion then rendered is much the same as that in the Anchor case:

"We find nothing in the facts of this case to take it out of the general rule, applicable in Georgia as elsewhere, that if one cause operates upon several persons at one time, it cannot be regarded as a general accident, but the injury to each individual is a separate accident, with-

28. Hall v. Royal Fraternal Union, 1908, 130 Ga. 820, 61 S.E. 977.

29. Penn Mutual Life Ins. Co. v. Childs, 1941, 65 Ga.App. 468, 16 S.E.2d 103, 105.

30. Mass. Benefit Life Ass'n v. Robinson, 104 Ga. 256, 30 S.E. 918, 42 L.R.A. 261. And see also American Aviation & General Ins. Co. v. Georgia Telco Credit Union, 5 Cir., 223 F.2d 206.

31. 246 P. at page 1056.

32. 33 A.L.R.2d 1029 et seq.

33. The handling of the Anchor case and this case by this court and the lower courts which have tried them tends to support the thought that the terminology under discussion is subject to more than one possible interpretation. Judge Ken-

nerly and the three circuit judges who rendered the Anchor decision were of the opinion that the words, each accident, were to be construed from the standpoint of the person injured by the accident. District Judge Hooper, who tried the case now before us, reached the same conclusion as did Circuit Judges Holmes and Borah when the case first came before this court on the present appeal. The members of the present panel are divided on the meaning. And yet the majority tells us that the meaning of the phrase is so clear that reasonable men can have but one view as to that meaning.

34. See slip opinion filed herein December 15, 1954.

in the meaning of an insurance contract in a specified sum against liability to pay claims for personal injuries or property damages * * *. The words each accident, as used in the policy in suit, *must be construed from the point of view of the person whose property was injured.*"

For the reasons stated I am of the opinion that the decision reached by that panel in this case was correct independent of the Anchor case. I am further of the opinion that the Anchor case is not distinguishable from the present case and that it ought to be followed.

The heart and sinew of Anchor was this:[35]

"The wording 'each accident,' as used in the policy, must be construed from the point of view of *the person whose property was injured.* In Bouvier's Law Dictionary, an accident is defined as an event which, in the circumstances, 'is unusual and unexpected *by the person to whom it happens*'."

The heart and sinew of the majority opinion here is contained in these words:

"They [ordinary people] normally use the word 'accident' to describe the *event,* no matter how many persons and things are involved. [Emphasis not supplied.]

" * * * we think it clear that the word 'accident' as used in the disputed phrase was intended to be construed from the point of view of the *cause rather than the effect.*"

These two holdings cannot be reconciled because they represent a complete shifting of point of view, a change in philosophy, a metamorphosis with respect to legal principles. In both cases liability policies are involved. In both the insurance relates solely to protection of the insured against his liability to third persons. The words to be construed are substantially the same. What this court has done is to shift the emphasis from the effect on those receiving the injury, and therefore on the insured, to the cause of the event insured against.

That constitutes a change of attitude and approach, a complete shift of emphasis, the acceptance of a new set of legal principles and the repudiation of another.

Thus is a well considered decision of this court, based upon the clear weight of authority, stricken down by an undocumented opinion based solely upon the *ipse dixit* of the majority essaying to declare as a matter of law what the average man means when he employs the language here involved. The result is, in my opinion, unjust to appellee; and, more than that, it tends to set a bad precedent in a field of law so impregnated with public interest.

## VII

Not only did appellee have a stake in the law's remaining the same when he sought to enforce his rights as it was when he acquired them, but it was and remains important that lawyers may be able to advise their clients with the assurance that what the courts have declared to be the law will remain such unless and until there is reason of a transcendent nature to change it.

Of importance comparable to the doing of justice between the parties now before the court is that certainty and stability shall attend judicial decisions. Since we are functioning here as a Georgia court it is proper to quote what the Supreme Court of that state has to say on the subject:[36]

"The application of the doctrine of stare decisis is essential to the performance of a well-ordered system of jurisprudence. In most instances, it is of more practical utility to have the law settled and to let it remain so, than to open it up to new constructions, as the personnel of the court may change, even though grave doubt may arise as to the correctness of the interpretation originally given to it."

The same thought has been well expressed in a recent utterance by a Justice of the Supreme Court of the United States:[37]

---

35. The quotation from 178 F.2d at page 324 is repeated so as to be considered alongside the language used by the majority here.

36. Cobb v. State, 1939, 187 Ga. 448, 200 S.E..796, 798, 121 A.L.R. 210.

37. Dissent of Mr. Justice Frankfurter in United States v. Rabinowitz, 339 U.S. 56, 86, 70 S.Ct. 430, 444, 94 L.Ed. 653.

"Especially ought the Court not reinforce needlessly the instabilities of our day by giving fair ground for the belief that Law is the expression of chance—for instance, of unexpected changes in the Court's composition and the contingencies in the choice of successors."

We are dealing here, not with an outmoded decision, eroded by time. Anchor represented the best thought of a distinguished district judge, unanimously approved after deliberate study by a panel of respected judges of this court. Anchor also had, as an authority in the present case, the sanction of the district judge the majority now puts in error for following our Anchor decision, and the approval of a majority of another panel of this court.

To set aside these deliberate and measured functionings of the judicial process in a case representing nothing more important under the most extreme view than rescuing a litigant which occupies inevitably a favored position in making contracts from its own ineptitude is to do violence to an important social policy.

The traditional standing of this court for stability and for steadfast adherence to the fundamental principle that ours is a government of laws and not of men will not be enhanced by what the majority is here doing. I cannot do other than register and document my dissent.

Rehearing denied: CAMERON, Circuit Judge, dissenting.

On Appellee's Application for Leave to File a Second Motion to Vacate and for Rehearing by the Whole Court En Banc.

Before HUTCHESON, Chief Judge, BORAH, RIVES, TUTTLE, CAMERON, JONES and BROWN, Circuit Judges.

PER CURIAM.

Special leave having been granted for the untimely filing of the above motion and the motion having been considered by the circuit judges of the circuit who are in active service, it is ordered that the same be and it is hereby denied.